THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JASON GRAY, Defendant-Appellant.

First District (6th Division)   Nos. 1—88—3606, 1—89—0889 cons.

Opinion filed May 14, 1993.

Randolph N. Stone, Public Defender, of Chicago (Mark Floyd Pasterski, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Randall Roberts, and Howard D. Weisman, Assistant State's Attorneys, of counsel), for the People.

JUSTICE EGAN delivered the opinion of the court:

The defendant, Jason Gray, and Manuel Bobe were indicted for the first degree murder of three persons. The cases of Bobe and the defendant were severed. The defendant was convicted of first degree murder and sentenced to life imprisonment without parole on each murder, each term to run concurrently. Bobe was subsequently convicted of first degree murder and sentenced to three concurrent terms of natural life imprisonment. We affirmed Bobe's conviction and sentence. *People v. Bobe* (1992), 227 Ill. App. 3d 681, 592 N.E.2d 301.

After the judge denied the defendant's motion for a new trial, the defendant filed a supplemental motion for a new trial based on newly discovered evidence. The judge first granted the motion but later granted the State's motion to reconsider and denied the supplemental motion for a new trial.

After his conviction and sentence, the defendant filed a petition for post-judgment relief pursuant to section 2—1401 of the Code of Civil Procedure. (Ill. Rev. Stat. 1989, ch. 110, par. 2—1401.) The trial judge denied the petition. In his direct appeal, the defendant contends that he was denied effective assistance of counsel. In his post-judgment petition, the defendant contends that the State obtained his conviction by the use of perjured testimony. The direct appeal and the appeal of the denial of the post-judgment petition have been consolidated by this court. The defendant does not challenge the suffi-

ciency of the evidence, the denial of his motions to suppress his statement or his identification or the denial of his supplemental motion for a new trial.

On the night of November 7, 1986, a group of teenagers were gathered for a party in a basement at 6318 South Washtenaw in Chicago. Shortly after midnight, there was a knock at the basement door. When Jessie Villagomez partially opened the door, an intruder pushed on the door and fired several shots into the party and fled. The shots struck four teenagers, killing three of them: Michael Villasenor, Joe Torres, and Mario Martinez. Jose Mendez was shot in the chest but survived. The evidence later established that Michael Villasenor and Joe Torres were members of the Two-Two Boys street gang. The defendant and Bobe were members of the Two-Six gang. The gangs were rivals.

Joanne (Holly) McGuire, who was 13 years old at the time of the shooting, testified that she attended the party at 6318 South Washtenaw. McGuire lived next door. At around 12:15 a.m., McGuire came back into the basement, which she described as being brightly lighted. She heard a knock on the back door which caused her to turn and look at the back door. She was standing approximately eight feet from the back door when she saw Jessie Villagomez partially open the back door. The door was pushed from behind and was flung open. As the door rebounded, she saw "flashes of guns" and heard shots. In the doorway, she saw the defendant's face. Her view of the defendant was unobstructed. She had known the defendant, a 15 year old at the time, from Marquette elementary school. She had known him for two years and knew he was a member of the Two-Six gang. She saw a silver-colored gun being held by the defendant with both hands. She saw him shoot Mike Villasenor, who then staggered and fell. She heard a total of six shots. After Villasenor was shot, she crouched on the floor. About 15 seconds later, she got up and saw three bodies lying on the floor.

When interviewed that night by the police, because she was "scared" of the defendant, McGuire initially told the police that she did not see anything happen. After speaking with a friend that same night, she told the police that she saw Jason "Ace" Gray shoot into the party. She later identified the defendant in a lineup composed of nine Hispanics and one white boy. The defendant was the white boy; he had blond hair. She denied having anything alcoholic to drink that night.

Sam Rahder testified that he was a member of the Two-Two Boys street gang. On November 7, 1986, Rahder picked up three fellow

Two-Two gang members, Jessie Alvarez, Joe Torres and Michael Villasenor. After stopping at a party at 63rd and Rockwell, Rahder and the others went to the party at 63rd and Washtenaw. After about an hour, Rahder and Alvarez left the party to pick up Alvarez's friends in Cicero. On their way, they stopped at a 7-11 store to buy cigarettes. When they pulled into the parking lot, they saw a blond white boy and a Mexican boy beating up two other boys. As Rahder and Alvarez got out of the car, the blond boy, identified by Rahder as the defendant, and the Mexican boy got into a green Eldorado. After buying cigarettes, Rahder and Alvarez left the 7-11, drove a short distance and then noticed the green Eldorado pull alongside them. The defendant was seated in the back seat behind the driver. The defendant and the other boy were displaying the Two-Six gang signal to Rahder. The defendant and the Mexican boy also threw bottles at Rahder's car. Alvarez and Rahder responded with Two-Two hand signals and then sped past the defendant, heading toward Cicero.

After picking up their two friends in Cicero, Alvarez and Rahder returned to the party at 63rd and Washtenaw. While they were stopped at a stop sign, the green Eldorado again pulled up beside them. The Mexican boy and the defendant jumped out of the Eldorado. Rahder and his three passengers jumped out of their car. The defendant and the Mexican boy retreated to the green Eldorado and sped away. Rahder and his fellow Two-Two gang members followed the Eldorado but turned around after Rahder realized they were in the heart of Two-Six territory.

Upon arriving at the party, Rahder and the others entered the basement through the back door. Rahder recognized fellow Two-Two gang members and Ambrose gang members at the party. At the time the Two-Two gang and Ambrose gang were allied. Rahder was at the party when the shots were fired, but he did not see who had fired the shots.

Sylvia Onoroto testified that her mother dropped her off at the party about 7:15 p.m. Once inside the house, she went to the front window to see if her mother had gone. She saw a green Eldorado driving very slowly as it passed the house. The Eldorado circled the block four times, passing slowly by the house each time. When she noticed her mother had gone, she joined the party in the basement. Before the shooting occurred, two girls whom Onoroto did not know came through the back basement door into the party. Both girls were wearing identical black and beige jackets; black and beige represented the colors of the Two-Six gang. The girls walked around the party but

did not speak to anyone. After walking around the party, the two girls left.

Detective Michael Kill, a member of the Area 3 Violent Crimes Unit, testified that he spoke to the defendant at 12:10 a.m. on November 9, 1986. After Kill read the defendant his rights, Kill asked the defendant whether he had a nine-millimeter automatic. The defendant told Kill that he did not have a nine-millimeter automatic but had a .380 automatic. The defendant said that he had gotten the .380 automatic earlier in the day, but he did not know where it was at the time. Kill also asked the defendant who was at the party where the shooting occurred. The defendant said that he was at the party but that he did not have anything to do with the shooting. The conversation lasted 15 minutes, during which the defendant was responsive, alert and giving "a perfect reaction." Kill did not write the statement down or make a summary of the conversation in any police report. He was not assigned to the investigation at the time he spoke to the defendant.

Sergeant Vincent Lomoro, an evidence technician with the Chicago police crime detection laboratory, testified that five bullets were recovered from the victims' bodies and five cartridges were recovered at the scene of the shooting. The bullets and cartridges were the type designated for a .380 automatic. All bullets and cartridges were from the same gun.

Jose Mendez, a Two-Two gang member, testified for the defense that he was at the party and left to go to a restaurant. When he came back to the party, he saw four male teenage Latinos, whom he did not know, walking away from the party. When the shooting began, Mendez saw that the basement door was open; he also saw flashes. Mendez was standing near the three victims, his friends, when the shots were fired; he was shot in the chest. He could not identify who was in the doorway because he was not looking at the door when the shots were fired.

Jessie Villagomez, an Ambrose gang member, testified for the defense that immediately before the shooting two girls knocked at the door. Those at the party did not want to let the girls in because they were from another street gang. He did not let them in. After these two girls left, Villagomez answered another knock and opened the door. He opened the door about six inches and saw only a gun and a hand in the doorway. He did not see who did the shooting. On cross-examination, without objection, he explained the meaning of the Two-Six gang tattoo: the three dots symbolized rape, robbery and murder. He also said that he "met or ran into" the defendant outside the

party and then he went back to the party. (Villagomez's testimony about meeting the defendant is the focal point of the post-judgment motion.)

Detective John Koclanis testified that he supervised a lineup of nine Hispanics and the defendant, the only white boy. The lineup was viewed by Joanne McGuire, Jessie Alvarez and Noel Gonzalez. Only McGuire identified the defendant from the lineup. Koclanis made out a report that did not refer to Detective Kill's interview with the defendant, although Kill did speak to Koclanis in the early hours of November 9 about Kill's conversation with the defendant. Kill was named on the report as a participating officer.

The defendant testified that he did not shoot anyone, did not possess a gun and was not at the party on November 8. He was at Yvonne Burgos' house at 5454 South Albany at 12:30 a.m., babysitting a one-year-old child of Darlene Subasik, his friend. At 12:30 a.m., he was alone in the house with the baby. Between 11 p.m. and 11:30 p.m., the defendant left the house to drop off two friends that were with him at Yvonne's apartment. On the way back to Yvonne's apartment, he drove by the party at 63rd and Washtenaw but did not stop there. He denied that the incident to which Sam Rahder had testified ever occurred; he did not know Sam Rahder. He did know Jesse Villagomez, whose cousin had two children with the defendant's sister. He denied meeting Villagomez on the night of the shooting.

He testified that during his interview with Kill, he was handcuffed to a chair when he told Kill that he was babysitting "at Yvonne's house." Kill used both hands to grab the defendant by the collar of his shirt and to throw him to the ground. Kill came in a second time during which the defendant told him that he had driven by 63rd and Washtenaw in the evening but before the murders occurred. Kill was the first officer to whom he told this. He said, "Officer Kill scared me, so I decided to tell the truth." He testified that in his initial interview he told the police that from 4 p.m. through the entire evening of the shooting, he was at 5454 South Albany and had never left that address. He admitted that statement was a lie. He also initially told the police that he had watched movies with Darlene and Miquel that evening. He admitted that statement was also a lie. He denied that he told Kill he had a .380 automatic. He also denied that the tattoo dots stood for anything.

The defendant also said that he had told the police he had seen a bunch of people at a party and that he recognized them as being members of the Ambrose street gang. He admitted that he signed the statement he made to Assistant State's Attorney Bilyk in which he

said that he had been treated well by the police and had not been threatened or made any promises. He did not complain to Bilyk about being mistreated by anybody. He was a member of the Two-Six gang on the day of the shooting. He did not find out about the three deaths until 10:30 a.m. on November 8, when Edwin Cabrero came to his house and told him that the police were looking for him.

Darlene Subasik testified that she left her son and the defendant at her home at about midnight while the defendant watched television. She returned about 30 to 45 minutes later, and the defendant spent the night. The defendant lived with his mother on 18th Street.

Officer Kill testified in rebuttal that he had not mistreated the defendant.

The defendant's entire direct appeal is based on several instances of alleged ineffective assistance of counsel. He first alleges that his attorney was ineffective for failing to call Jesse Alvarez as a witness.

In the opening statement, the defendant's attorney told the jury that Alvarez was in the basement at the time of the shooting, that Alvarez saw four Latinos in the doorway and that Alvarez did not see the defendant in the doorway. Alvarez was subpoenaed by the defendant's attorneys but refused to speak to them. The defendant's attorneys wanted to establish only that Alvarez refused to speak to them, but the judge would not permit them to restrict the examination of Alvarez to that single point. One of the defendant's attorneys said that she would call Alvarez as a witness anyway. The assistant State's Attorney then told the judge and the defendant's attorneys that there was "a chance that [Alvarez] might identify the defendant as being at the party or around the party at the time of the shooting or subsequent to it." The defendant's attorney said that, under the circumstances, she would not call Alvarez but asked that the State also be prevented from calling him. The assistant State's Attorney agreed that the State would not call Alvarez either. The defendant now maintains that his counsel was ineffective for failure to call Alvarez. We disagree.

■ Whether to call a particular witness generally is a matter of trial strategy. (*People v. Ashford* (1988), 121 Ill. 2d 55, 520 N.E.2d 332.) Before a conviction may be reversed for ineffective assistance of counsel, a defendant must meet his burden of showing that his counsel's performance was so deficient that it fell below an objective standard of reasonableness and that his counsel's performance so prejudiced his defense as to deny him a fair trial. (*People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246.) A defendant must overcome the strong presumption that the challenged actions of his attorney

might be considered sound trial strategy. (*Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052.) Therefore, the burden on the defendant in this court is to show that Alvarez would have testified in a way favorable to the defendant. He has not done so. Based on the record before us, we are unable to determine what Alvarez's testimony would have been. We note that when he testified later in *Bobe,* he identified the defendant as the person who fired the shots, and he also corroborated the testimony of Rahder as to the previous encounters with the defendant. See *Bobe,* 227 Ill. App. 3d at 686.

It is true that, if Alvarez testified in the same manner he testified against Bobe later, he would have been impeached, as he was in *Bobe,* by showing that he named four Latinos as persons he saw in the doorway, that he did not tell the police he saw a blond white boy in the doorway and that he did not tell the police of his earlier encounters with the defendant that evening. (*Bobe,* 227 Ill. App. 3d at 686.) In addition, Alvarez would have been impeached by the testimony of the police officers that he failed to identify the defendant in a lineup. Nonetheless, a reasonable argument could be made that, if Alvarez's testimony against the defendant would have been the same as it was in *Bobe,* Alvarez's testimony would have been highly damaging to the defendant. Consequently, it cannot be said that the defendant's attorneys were ineffective by failing to call Alvarez. Certainly it can be said that the defendant has failed to maintain his burden of overcoming the strong presumption that the challenged actions of his attorney might be considered sound trial strategy.

Before leaving this point, we will answer the defendant's attorney's claim in oral argument, not in his brief, that the State in closing argument unfairly asked why the defense had not called Alvarez. We have read both sides' closing arguments. The State's argument was invited by the defendant's attorney, who told the jury that the State should have called several other witnesses, including Alvarez, and asked the State to explain why they were not called.

The defendant next contends his attorneys were ineffective by failing to "prevent" the testimony of Detective Kill. The defendant made a motion to suppress all statements on the ground that juvenile standards were not followed and, therefore, the statement was a product of coercion. The judge denied the motion to suppress. Later, the State filed a supplemental discovery answer in which it informed the defendant of the statement made to Kill. The defendant filed a motion *in limine* to exclude Kill's testimony. The judge denied the motion. We construe the defendant's argument to be that the ineffec-

tive assistance of counsel lay in the fact that his attorneys waited until August 1988 to make the motion to exclude Kill's testimony even though they learned on November 5, 1987, that Kill was prepared to testify that the defendant had made a statement to him. Once again, we must invoke the rule of *Albanese* and *Strickland* and hold that the defendant has failed to establish that, but for the lapse in time in making the motion to exclude Kill's testimony, it was reasonably probable that the result of the proceedings would have been different. *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068; *Albanese*, 104 Ill. 2d at 525.

■■ The defendant next contends that an instance of ineffective assistance of counsel occurred during the cross-examination of Villagomez. The prosecutor asked Villagomez about the meaning of the three dots tattooed on his hand which represented the sign of the Two-Sixers. Villagomez said they represented murder, robbery and rape. No objection was made to Villagomez's answer. (The forewoman of the jury had been the victim of a rape.) We agree that an objection should have been made, but we do not agree that a new trial should be granted for failure of the defendant's attorney to object. Under *Albanese* and *Strickland*, a defendant must establish " 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " (*Albanese*, 104 Ill. 2d at 525, quoting *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.) We judge that the jury verdict would have been the same even if the defendant's attorney had objected. Indeed, we judge that the jury verdict would have been the same even if Villagomez had not testified to the meaning of the tattoo marks. We note that the defendant testified that the tattoo marks did not symbolize anything.

In our judgment, the case against the defendant, while not overwhelming, was a strong one. The identification of McGuire, who was not a stranger to the defendant, was corroborated in large measure by Rahder, to some degree by the cross-examination of Villagomez and, most important, by the defendant's own testimony that he was in the vicinity of 6318 Washtenaw that night. (The defendant did not deny that he knew McGuire.) The defendant admitted lying to the police, which may be considered a reflection of a consciousness of guilt. Officer Kill's testimony that the defendant told him he owned a .380 automatic and was at the party, if believed, was also damaging to the defendant's case. In addition, the defendant's own testimony contradicted his alibi witness, Darlene Subasik, who testified that the

defendant did not leave her house. We conclude, therefore, that the failure to object did not constitute ineffective assistance of counsel.

We have considerable difficulty in determining precisely what other conduct on the part of the defendant's attorneys the defendant now contends is ineffective assistance. We gather that he maintains that his counsel either misunderstood the judge's ruling about a discovery cut-off date or his counsel motioned for the wrong cut-off date in the first place. He also maintains that his counsel were ineffective because they did not go to trial immediately after the judge ordered a new trial, because the delay in the trial gave the judge a chance to change his mind. Neither contention merits any further discussion other than to say that they do not support a finding of ineffective assistance of counsel.

For these reasons, the judgment of the circuit court on the direct appeal is affirmed.

We turn now to the defendant's appeal of the order denying his petition brought under section 2—1401 of the Code of Civil Procedure. (Ill. Rev. Stat. 1987, ch. 110, par. 2—1401.) The purpose of a section 2—1401 petition is to bring before the court facts which, had they been known at trial, would have prevented the entry of the contested judgment. (*People v. Sanchez* (1989), 131 Ill. 2d 417, 546 N.E.2d 574.) Although the petition is usually characterized as a civil remedy, its remedial powers extend to criminal cases. *Sanchez*, 131 Ill. 2d at 420.

The petition must establish adequate grounds for such relief and must show that the petitioner was not negligent in failing to raise the ground at trial. (*People v. Jennings* (1971), 48 Ill. 2d 295, 269 N.E.2d 474.) The appropriate standard of review is whether the trial judge abused his discretion. *Sanchez*, 131 Ill. 2d at 420.

In this case, the trial judge dismissed the petition without an evidentiary hearing on the basis that: (1) the trial court did not have jurisdiction and (2) if the trial court had jurisdiction, the allegations in the petition did not sufficiently allege facts which would have entitled the defendant to relief.

On December 6, 1988, the defendant filed a notice of appeal from the judgment of conviction. On January 24, 1989, he filed his section 2—1401 petition. The trial judge held that he lacked jurisdiction because of the pendency of the direct appeal. A trial court may hear a section 2—1401 petition, despite the pendency of a direct appeal because the petition constitutes a new action. (*People v. Alfano* (1981), 95 Ill. App. 3d 1026, 420 N.E.2d 1114.) Therefore, a dismissal of this petition on the ground of lack of jurisdiction was not proper.

We will now address the sufficiency of the petition. Where perjury is the basis of a section 2—1401 petition, facts must be alleged and proved by clear and convincing evidence which show that false testimony was willfully and purposely given, that it was material and not merely cumulative and that it probably controlled the determination. (*People v. Jennings* (1971), 48 Ill. 2d 295, 269 N.E.2d 474.) The petition, in substance, alleges that Villagomez committed perjury at the trial. Although, at this stage, there is no dispute between the parties over whether Villagomez committed perjury, our discussion must begin with the specific testimony of which the defendant now complains. Villagomez testified for the defendant that he could not see who did the shooting. He could see only a gun and a hand; he never identified the defendant as the shooter. In response to a question by the defense, Villagomez testified that he had been interviewed by the prosecution two days before he testified. He also testified that he was on probation.

The following examination by the State is the crucial testimony:

"Q. You were not at the party the entire evening, were you?

A. No, I wasn't.

Q. Isn't it a fact that you left the party just before or a time before the shots were fired?

A. Yes.

Q. Isn't it a fact that you met or ran into the defendant, Jason Gray?

A. Yes, I did.

Q. *And that was just before it, right?*

A. Right." (Emphasis added.)

On redirect examination the defendant's attorney established only that Villagomez had been subpoenaed by the defense, that his gang was an enemy of the Two-Six street gang and that he was not a friend of the defendant. On re-cross-examination the prosecutor asked whether he had spoken to the defendant on the evening of the shooting. The defendant's attorney objected on the ground that the question was beyond the scope of the redirect examination. The prosecutor withdrew the question.

The defendant's attorney made a motion for a mistrial. She said that she had an understanding with the prosecution that if anyone was going to identify the defendant "as having been at the party, you know, being there, \*\*\* so that [the defense] would not have what [they] have just had, which is trial by ambush." She said that Villagomez's testimony was known to the prosecution but it had taken the defense by surprise. She then accused the State of "underhanded

methods" and "reprehensible and irresponsible prosecutorial miscon-duct." She also said that the prosecutors had lain "in the weeds" and had violated the judge's discovery order. Without asking the prosecutors to respond, the judge said the following:

"I would note the testimony of Mr. Villagomez simply said he left the party for awhile, saw the defendant, did not say where and what relationship to time or place to the incident where the shooting took place. It was not verified either on direct or cross-examination. I would, therefore, find and respectfully deny your motion for a mistrial. I would preclude the State from argument that the witness had put Mr. Gray at the scene."

Further colloquy ensued between the judge and counsel. The defendant's attorney also told the judge that Villagomez had "lied" to them in their interview with him. The defendant's attorney asked the judge to order the State to disclose to the defense if they had "some other impeachment that they are not telling us." The prosecutor pointed out that the defendant's discovery answer did not inform the State who the defense witnesses would be. Consequently, he said, the State had no way of knowing who the defense witnesses would be.

The defendant's petition for relief pursuant to section 2—1401 included the affidavit of Villagomez in which he alleged as follows:

"(1) On Friday, August 5, 1988, I appeared in Judge Suria's court pursuant to a defense subpoena. There in open court and in front of the State's Attorneys, Judge Suria ordered me to return the following Wednesday, August 10, 1988.

(2) Over the weekend I received a subpoena from the State's Attorneys to go to their office on Monday, August 8, 1988. I went there.

(3) While there I was interviewed by three State's Attorneys, including the one who cross-examined me, Anthony Calabrese. I don't know who the other two were.

(4) At that interview I told them I had seen Jason Gray earlier in the day of the shooting, *not* moments before the shooting as the prosecutor made it appear at trial.

(5) I felt I was in trouble with the State and had better cooperate with them. So when they told me not to tell the defense that I had been subpoenaed by them or what I told the State, I obeyed their instructions. I also felt that the prosecutors were putting words in my mouth.

(6) I am no friend to Jason Gray, in fact, we are enemies.

(7) It was and is my impression that the State's Attorneys were threatening to charge me with some crime, and it is for this reason I

hired an attorney, Mr. Novelle, although I am innocent of any wrong-doing.

(8) I did *not* see Jason Gray at the party, near the party or near in time to the shooting." (Emphasis in original.)

The judge heard oral argument on the petition on February 22, 1989. We conclude from the remarks of the judge and counsel that the hearing on the petition had been continued to give the parties an opportunity to brief the question of whether the judge had jurisdiction. The judge asked the defendant's attorneys what the "thrust" of the petition was. The defendant's attorney told the judge that Villagomez had come to them after the trial had been completed and told them that his testimony was perjury. The prosecutor pointed out that Villagomez was the defendant's own witness. After hearing the statements of the prosecutor and the defense attorney, the judge said that there was no basis for his holding a hearing and denied the request for a hearing. He concluded that there was no allegation of wrongdoing on the part of any parties, only the witness, and that the affidavit did not explain why the witness committed perjury.

The State did not file a response to the petition and in argument did not attempt to refute any of the allegations of Villagomez's affidavit. Consequently, we must, at this point, accept the allegations of the affidavit as true. (*Withers v. People* (1961), 23 Ill. 2d 131, 177 N.E.2d 203.) Accepting the allegations as true, we find that the State knew that Villagomez had been subpoenaed by the defense. The State then subpoenaed Villagomez, and the subpoena apparently ordered him to appear in its office, a procedure which is arguably an abuse of process. (*Cf. People v. Hart* (1990), 194 Ill. App. 3d 997, 552 N.E.2d 1 (improper for subpoena *duces tecum* to provide for delivery of documents to the State's Attorney's office rather than to the court).) According to other allegations of the petition, Villagomez had been interviewed by the police, and several summaries of his conversations with the police appeared in the police reports. In none of the police reports was there any indication that Villagomez had told any police officer or anyone else that he saw the defendant at or near the scene of the shooting or at any time during the day of the shooting. According to Villagomez's affidavit, he told the prosecutors in their office that he had seen the defendant earlier in the day of the shooting and not moments before the shooting. Moreover, the prosecutors told Villagomez not to tell the defense that he had been subpoenaed by the State or that he had told the prosecutors that he had seen the defendant earlier on the day of the shooting and not moments before the shooting. If that last statement is true, it lends support to the defendant's at-

torney's argument on the motion for mistrial that the State engaged in "trial by ambush."

We turn now to the cross-examination of Villagomez. We disagree with the trial judge's conclusion that Villagomez's testimony did not express a time between his meeting with the defendant and the shooting. Villagomez's testimony on cross-examination was that he saw the defendant just before the shooting. And if Villagomez saw the defendant just before the shooting, the defendant must have been near the shooting. That testimony by a defense witness was strong corroboration of McGuire's testimony. It was material and not merely cumulative.

The prosecution used Villagomez's testimony in closing argument. In the defendant's attorney's closing argument he said that Villagomez was lying and that he "had set [the defense] up." He also asked why the State had not called all the witnesses. In response the prosecutor explained why he had not called certain witnesses. He said that he would have liked to have called Villagomez and that he would like to have Villagomez sitting next to the defendant because "that's where he belongs." He said he was not going to call someone "who was an accomplice to this offense." He added:

> "And I may have not had enough evidence to prove him guilty, but we have enough to prove him. *The man who went out and got Jason Gray or met Jason Gray*, the one who opened the door? Villagomez? The one who first opens the door for the Two-Two ladies or, Two-Six ladies, and then gets behind the door and everyone else gets hit and hurt but him? That's who they want me to call as a witness?" (Emphasis added.)

We note, although the defense did not object at trial or make an issue of this argument in this court, that the prosecutor's argument violated the direction of the trial judge, when he denied the motion for a mistrial, that the prosecutors were not to argue that Villagomez had put Jason Gray "at the scene."

The remaining question before us, therefore, is whether Villagomez's willfully false and material testimony "controlled the determination" of the case. (*Jennings*, 48 Ill. 2d at 299.) The trial judge apparently concluded that Villagomez's testimony did not "control the determination" of the case because the judge felt that Villagomez's testimony did not place the defendant near the shooting at the time of the shooting. Because we conclude that the trial judge misinterpreted Villagomez's presumptively false and material testimony, we also hold that the judge abused his discretion in denying the motion without a

hearing. For this reason, we must remand the case for a hearing on the defendant's section 2—1401 petition.

Since this case is being remanded, another more serious aspect of the case should be considered. It is an aspect that was raised briefly by the trial judge but was not raised by the defense in either the trial court or in this court. We raise it now *sua sponte*. That aspect involves the obligations of the prosecution under *Napue v. Illinois* (1959), 360 U.S. 264, 3 L. Ed. 2d 1217, 79 S. Ct. 1173, and *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194.

The general rule provides that points not argued in the trial court are waived as are, needless to say, points not raised in the reviewing court. But an exception to the general rule exists if the intervention of the reviewing court is necessary to achieve a just result. Reviewing courts, we are instructed, are more than umpires. (*Wozniak v. Segal* (1974), 56 Ill. 2d 457, 308 N.E.2d 611.) We may not avert our eyes from what is clearly before us.

In this case, the defendant's attorneys argued that the defendant was entitled to relief under section 2—1401 because Villagomez had committed perjury. They have so argued in this court. They have not claimed in the trial court, or in this court, that the defendant's constitutional rights were violated because the prosecutors knew that Villagomez's testimony on cross-examination was false (*Napue v. Illinois* (1959), 360 U.S. 264, 3 L. Ed. 2d 1217, 79 S. Ct. 1173) or that the prosecutor suppressed evidence favorable to the defendant. (*Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194.) We make these observations because our analysis of Villagomez's affidavit arguably supports one or both of those claims.

Villagomez said in his affidavit that he told the prosecutors that he had seen Gray some time earlier in the day and not "shortly before" the shooting. If that is true, then he testified falsely before the jury and the prosecutors knew it was false. If his statement in his affidavit is true, the prosecutor should not have even asked the question in the form that he did.[1] And when the prosecutor got the answer that he did, if he knew that Villagomez had told him something different in his office, the prosecutor was under an obligation under *Napue*

---

[1] Villagomez testified later for Bobe, who was represented by other counsel. The State was represented by the same assistant State's Attorneys who prosecuted in this case. Villagomez's direct testimony in *Bobe* was the same as it was in this case. The prosecutors, however, did not ask Villagomez anything about seeing Gray before the shooting.

and *Brady* to bring to the attention of the judge and jury the previous inconsistent statement made by Villagomez.

When we said that the judge briefly touched on this aspect of the case, we were referring to the judge's statement, which he made after the parties had completed their argument, that there was no allegation of "wrongdoing on the part of *** any party to this litigation except the witness himself." The judge also said that he was denying the motion without a hearing because the allegations made in the petition gave no reasons for Villagomez's recantation. No one made any effort to disabuse the judge of his observations. We must, however, disagree with the judge. Villagomez's affidavit does contain allegations of fact which might support a finding of wrongdoing on the part of the prosecutors and that Villagomez did give reasons for his false testimony.

We wish to make our position clear that we have not made any prejudgments of the facts. We simply say that the allegations of the petition are such that, taken as true, they could establish violations of the defendant's constitutional rights. From a very technical aspect, a post-conviction petition would be the more proper vehicle to explore this claim, but judicial economy dictates that the defendant be permitted to argue this claim now under the section 2—1401 petition rather than have it raised later in a post-conviction petition or a petition for a writ of *habeas corpus* in the Federal district court.

For these reasons, the judgment of conviction in appeal No. 1—88—3606 is affirmed. The judgment in appeal No. 1—89—0889 is reversed and the cause remanded for further proceedings consistent with this opinion.

No. 1—88—3606, affirmed.
No. 1—89—0889, reversed and remanded.

McNAMARA, P.J., and GIANNIS, J., concur.