THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BERNARD ELLIS, Defendant-Appellant.—BERNARD ELLIS, Petitioner-Appellant, v. THE PEOPLE OF THE STATE OF ILLINOIS, Respondent-Appellee.

First District (5th Division)   Nos. 1—96—0804, 1—99—0105 cons.

Opinion filed August 25, 2000.

Jenner & Block, of Chicago (Robert L. Denby, Samuel S. Miller, Marc A. Van Allen, and John T. Ruskusky, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Judy L. DeAngelis, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HARTMAN delivered the opinion of the court:

A jury convicted defendant Bernard Ellis of the first-degree murder of Gerard Hardy. He was given a 55-year prison sentence. His subsequently filed postconviction petition, after a hearing, was denied. Defendant's motion to consolidate his direct appeal and his appeal from the denial of the postconviction petition was allowed. Defendant appeals his conviction and sentence, the denial of his motions for a new trial, and the denial of his postconviction petition.

Defendant raises as issues on appeal whether: (1) a juror should have been dismissed for cause; (2) he was denied his right to a fair trial and due process of law by the State's knowing use of its two eyewitnesses' allegedly perjured testimony and other prosecutorial misconduct; (3) he was denied his right to the effective assistance of trial counsel; and (4) he is entitled to a new trial based on newly discovered evidence. Only issue (2) will be addressed in this consolidated appeal in light of the reversal and remandment of the case based upon the determination of that issue.

On July 12, 1991, at about 2 a.m., Ramon Bickham, Tony Scales, and Gerard Hardy, the murder victim, were selling drugs at 13th and Wentworth in Chicago Heights, Illinois. Defendant emerged from the passenger side of a brown or orange Cutlass and walked toward the victim's white Cutlass, parked nearby. Both Bickham and Scales were standing on the corners across the street from the victim and defendant's parked car, about 15 to 25 feet away. Defendant, dressed in black and wearing a baseball cap, called the victim's name, the

victim turned, and both Bickham and Scales saw or heard a gunshot. The victim fell to the ground. Defendant had been standing about three to four feet away from the victim with his arm extended when he shot the victim once in the head. He shot the gun in the air a few more times, jogged back to the Cutlass, which he entered, and the car left. Both Bickham and Scales later identified defendant as the assailant.

Bickham had seen defendant for several months "around the hood," knew him as a rival gang member, but never met him. He did not recognize defendant immediately, but did when he walked closer to the victim. Bickham previously had been convicted of possession of a controlled substance and had a current case pending at the time of trial. He asserted that no promises had been made to him regarding his pending case in exchange for his testimony at defendant's trial. Because he was in shock and scared, Bickham did not tell the police who the shooter was until January 14, 1992, when he was at the Shawnee Correctional Center. Defendant had "rank" or "authority" in the rival gang with which they had problems.

Scales had known defendant previously for 1½ years and had seen him around the "hood" about 100 times, the first time at a Gangster Disciples or "folks" meeting in May 1990. He knew defendant had "rank." Scales previously had been convicted of possessing a controlled substance. He testified that he had a case pending at trial time; however, the State made no promises to him in return for his testimony. Scales left the scene when the police arrived because he was scared. He did not tell the police that he knew who the shooter was prior to December 17, 1991, because defendant was still at large. Scales, who was still living in the area, did not want anything to "happen" to him.

In November 1991, Anthony Willingham, a former Vice-Lord, and Remone Butler, stood at the corner of 13th and Wentworth, the same corner where the murder took place a few months before, when defendant, whom Willingham knew from the neighborhood, got out of a dark-colored Cutlass and approached them while carrying a machine gun. He either pointed the gun or stuck the gun in Willingham's side and asked the witnesses the whereabouts of a certain drug dealer, whom Willingham and Butler both knew. Defendant told them that their friend was a "dead man" and that he was going to kill him. He also bragged about having killed the victim and that he had killed or would kill more "niggers."

In court, prior to trial, the defense requested of the State information as to previous written and oral defense inquiries concerning "discussions with any of the potential witnesses about any kind of

deals regarding their cases in return for [their] testimony," to which the State responded that, "with regard to those witnesses, Judge, who have pending cases, there's been no agreements or promises of any kind with regard to the disposition of their cases."

Following the instructions conference, closing argument ensued. Defense counsel attacked the credibility of all the State witnesses and argued that defendant was being framed for a murder which occurred due to gang "revenge." During deliberations, the jurors sent a note stating that they were at a "standstill." After consulting with counsel from both sides, they were told by the court to continue deliberating. One and one-half hours later, the jury reached the verdict previously noted.

Defense counsel moved for a new trial. Defendant also moved, *pro se*, for a new trial, in part on the ground that defense counsel failed to present evidence that would have exonerated him. The circuit court denied both motions. Following the presentation of aggravation and allocution by defendant, who claimed he was in another state at the time of the murder and that his trial counsel was ineffective in his representation, the court sentenced defendant as first noted. Defendant's sentence was to run consecutively to the 10-year sentence he had received from the same judge on a prior conviction.

Defendant filed a notice of appeal and a petition for postconviction relief. During a hearing on the postconviction petition, defendant presented his own testimony, in addition to the testimony of certain witnesses who had provided affidavits in support of his petition, including witnesses who claimed to have been able to provide defendant with an alibi and one, Anthony West, who claimed that he saw the murder, that defendant was not the shooter, yet he was not called as a witness. Defendant also presented the testimony of juror Robert Reed, who had been called into chambers and questioned during trial. Scales testified at the postconviction hearing that his trial testimony, identifying defendant as having shot the victim, was false, induced by Chicago police detective Joe Fiaoni with a promise of probation on criminal charges pending against Scales. This evidence was never refuted by the State; Fiaoni did not testify.

At the hearing, the State presented the testimony of the prosecutor who tried the case, as well as the defense attorney who represented defendant at trial. The prosecutor conceded that he "might have" told Scales that he would speak on Scales' behalf at his sentencing in exchange for his testimony at the Ellis trial, that he "might have" said that, but did not make the statement to Bickham until after the trial, and "most likely" the same was told to Scales under similar circumstances.

Following the hearing, and a review of the petitions by both parties, the appendices, and all trial transcripts, the postconviction judge, who also had served as the trial judge, denied defendant's postconviction petition. This consolidated appeal followed.

## I

Defendant contends that he was denied a fair trial and due process of law by the State's knowing use of perjured testimony and by other prosecutorial misconduct.

Defendant claims that, at trial, eyewitnesses Bickham and Scales testified that, although they had felony charges pending against them at the time of trial, the State made no promises to them in exchange for their testimony against defendant but that, at the postconviction hearing, Scales admitted that he lied at trial and claimed that Detective Fiaoni had forced him to testify falsely and promised him leniency on pending drug charges in exchange for his testimony against defendant. In addition, defendant asserts, one of the prosecutors admitted that he "could have" told Scales prior to trial that, if he testified truthfully against defendant, he would make this known to the judge presiding over their pending charges, which he did. As a consequence of the State's action, defendant alleges, Bickham and Scales received exceedingly lenient sentences, demonstrating that Bickham and Scales perjured themselves at trial and that the State knew that Bickham and Scales failed to disclose these promises under oath and concealed them.

■ The use of perjured testimony to obtain a criminal conviction violates due process of law. *People v. Olinger*, 176 Ill. 2d 326, 345, 680 N.E.2d 321 (1997) (*Olinger*). Even where the prosecution does not solicit false testimony, but allows it to go uncorrected when it appears, due process is violated. *Napue v. Illinois*, 360 U.S. 264, 269, 3 L. Ed. 2d 1217, 1221, 79 S. Ct. 1173, 1177 (1959) (*Napue*). A conviction obtained by the knowing use of perjured testimony, which reasonably could have affected the jury's verdict, will be set aside. *Olinger*, 176 Ill. 2d at 345.

During defendant's trial, Scales admitted to the jury that he had been convicted of possession of a controlled substance in 1991, 1992, and 1993 and that he had a similar charge and an unlawful use of weapon charge pending, but denied receiving anything in exchange for testifying against defendant. At Scales' own sentencing hearing, after pleading guilty, Scales reiterated that no threats, force or promises were made to him in order to plead guilty. The transcript from Scales' plea of guilty reveals that the State represented to the sentencing judge that it had not promised the witness any consideration for his

testimony. At the postconviction hearing, the State acknowledged that prior to testifying Scales "might have" been told that the State would inform the court if Scales had testified truthfully at defendant's murder trial. Scales was then sentenced to two years' felony probation, concurrent on both cases, with fines and costs satisfied by the time that Scales had actually served. The sentencing judge stated that "the only reason I sentenced you to \*\*\* [felony] probation \*\*\* is \*\*\* the representation of the State that you testified truthfully" at defendant's trial.

The other State eyewitness, Bickham, stated at trial that he had been twice convicted of possession of a controlled substance, once in 1990 and in 1991, and that he had a similar case pending. He denied receiving anything in exchange for testifying against defendant. At Bickham's own sentencing hearing, after pleading guilty, he also stated that no threats, force or promises were made to him in order to plead guilty. The State in Bickham's case told the sentencing judge that there were no promises or agreements as consideration for his testimony, that Bickham had testified truthfully at defendant's murder trial, and that "[a]fter the case, [it] indicated to the defendant [Bickham] that [it] would inform the Court" that he testified truthfully. The judge stated that, although it was only a "recommendation," he decided to "go along with" the "recommendation" and sentenced Bickham to six months as a condition of one year's felony probation, terminated satisfactorily *instanter*, "on the recommendation of the State." The judge stated further, "[n]ormally with a PCS case I give the drug program."

■ Also to be considered is Scales' testimony at the postconviction hearing that Detective Fiaoni both threatened him and then offered to help him if he fingered defendant as the shooter and that, as a result, Scales gave perjurious testimony at trial. Two other witnesses, West and Newman, testified to the same alleged improper pressure used by Fiaoni. As previously noted, Detective Fiaoni did not testify at the postconviction hearing, nor does the State argue that Detective Fiaoni made no promises. Assuming Detective Fiaoni made the promises as claimed, whether known or unknown to the prosecutor, "a due process violation occurred \*\*\* [since] there was knowledge [of them] by representatives or agents of the prosecution." *People v. Torres*, 305 Ill. App. 3d 679, 687, 712 N.E.2d 835 (1999) *(Torres)*; *People v. Diaz*, 297 Ill. App. 3d 362, 373, 696 N.E.2d 819 (1998) *(Diaz)*; see also *Olinger*, 176 Ill. 2d at 348; *People v. Cornille*, 95 Ill. 2d 497, 513, 448 N.E.2d 857 (1983). The prosecution is charged with the knowledge of its agents, including the police. *People v. Martin*, 56 Ill. 2d 322, 325, 307 N.E.2d 388 (1974). Neither the facts nor the law allows the State to

disassociate itself from the conduct of Detective Fiaoni in the present case, and the State is chargeable with this knowledge.

From the foregoing, the State's intent fairly may be inferred as support for more lenient sentences to be imposed upon Scales and Bickham; and this is exactly what happened.[1] Not only the leniency, but the timing of Scales' and Bickham's sentencings supports the conclusion that the State furthered its efforts to sustain its murder case against the instant defendant by assuring the cooperation of the two witnesses.[2] Eight days after Scales and Bickham testified at defendant's trial, both Scales and Bickham pled out on the same day that the State's murder prosecutor made his appearance before the judge sentencing Bickham and made the representation previously mentioned. Scales' sentencing judge said he was accepting "the recommendation" of the State and this was the reason the judge deviated from his normal sentencing. The combination of lenient sentences and the timing of the sentencing demonstrates that the State knew, or should have known, that the testimony denying any promises or agreements to benefit Scales and Bickham was false and perjurious. The State failed to fulfill its duty to correct any false assertion made by the witnesses denying their expectation of any consideration from the State in return for their testimony. *People v. Pecoraro*, 175 Ill. 2d 294, 677 N.E.2d 875 (1997) (*Pecoraro*).

Although the witnesses may not have made "deals" specifically requiring the State to request leniency in sentencing of their witnesses at their own trials in return for their testimony at the instant trial, the sentencing judge in each witness' case clearly so regarded the arrangements and the understanding reached was a distinct benefit to them about which the defense and jury previously should have been informed. The State's agreement with Scales and Bickham did not have to be so specific as to satisfy the requirement of a formal contract. *Diaz*, 297 Ill. App. 3d at 371. As the supreme court stated in

---

[1]Both Bickham and Scales were repeat offenders; their guilty pleas for drug possession made them eligible to three- to six-year prison terms. See 730 ILCS 5/5—5—3.2, 5—8—2(a)(6) (West 1994). Scales pled guilty to unlawful use of a weapon by a felon, for which he could have been sentenced to a term of two to five years. 730 ILCS 5/5—8—1(a)(6) (West 1994). Neither Scales nor Bickham was given prison time.

[2]For example, Scales' two cases had been pending since September 10, 1992, and January 9, 1993. Throughout 1993, 1994, and 1995, the State made no attempt to prosecute Scales' cases; instead, the State sought or agreed to 29 continuances of Scales' unlawful use of weapon case and 27 continuances of Scales' drug possession case. Three of the continuances occurred on December 4, 5, and 8, 1995, during trial of the instant case.

*People v. Jimerson*, 166 Ill. 2d 211, 227, 652 N.E.2d 278 (1995) (*Jimerson*), "due process of law cannot hinge upon such 'gossamer distinctions,' " quoting *People v. McKinney*, 31 Ill. 2d 246, 250, 201 N.E.2d 431 (1964).

The United States Supreme Court observed in *Napue*, 360 U.S. at 269, 3 L. Ed. 2d at 1221, 360 S. Ct. at 1777, "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." That language was quoted with approval in *Olinger*, 176 Ill. 2d at 345.

Illinois courts of review have addressed the issue of the obligations imposed upon the State when its witnesses are offered testimony in exchange for some beneficial treatment from the State. In the case *sub judice*, Bickham and Scales both testified that they received nothing in exchange for their testimony. Yet, the State admits that Scales may have been told by the prosecutor handling the Ellis case before trial that the judge who would sentence him in his own criminal matters would be informed of his cooperation. Evidence of Detective Fiaoni's alleged conduct and promises of probation stood unrefuted. The sentencing judge in each witness' case clearly acted on the State's representations to the benefit of the witnesses.

In a case analogous to the case *sub judice, People v. Perkins*, 292 Ill. App. 3d 624, 686 N.E.2d 663 (1997), two cooperating inmates testified that they observed defendant, a Cook County jail guard, permit another inmate to enter a cell interlock, give him a guard uniform and walk him off the tier. More than a year prior to trial, both cooperating inmates pled guilty to the charges pending against them at the time of the escape. One, Kmet, was sentenced to 8½ years in prison. Hamilton was sentenced to 12 years in prison. On direct examination, both cooperating inmates were asked, " '[n]ow in exchange for your testimony here today were you made any promises of leniency in order to testify not only today but before a grand jury that you've done previously?' " Both responded " '[n]o.' " 292 Ill. App. 3d at 627. At the posttrial motion for a new trial, Kmet's attorney testified that the State had initially offered his client 20 years on his charges, but after the judge was advised of Kmet's "cooperation," the judge sentenced Kmet to 8½ years. Hamilton's attorney testified that the trial judge in his client's case had initially offered him 17 years but after being advised of his cooperation, the judge sentenced Hamilton to 12 years. In reversing, the appellate court held: "[w]hile the colloquy between the State, Kmet, and Hamilton at trial was, as in *Olinger*, literally true (it is true that no promises of leniency were made by the State in this

case), the jury was, nevertheless, misled" (emphasis omitted) citing *Jimerson*, 166 Ill. 2d at 227 and *People v. Nino*, 279 Ill. App. 3d 1027, 665 N.E.2d 847 (1996) (*Nino*). *Perkins*, 292 Ill. App. 3d at 632.

In *Nino*, a witness, Aldava, was in custody on charges of residential burglary and arson in an unrelated case where he testified for the State in a murder case, " '[t]hey ain't give me no deal,' " he was " '*hoping*' " to get a deal, " '[b]ut I know I'm not going to get it.' " (Emphasis added.) 279 Ill. App. 3d at 1035. Aldava testified that he could get anywhere from 4 to 15 years in prison on his charges. The day after the jury convicted the murder defendant, the prosecutor who tried Nino's case appeared as the prosecutor in Aldava's case, reduced the charges against Aldava to burglary and Aldava was sentenced to probation. Aldava's attorney testified at Nino's posttrial motion for new trial that he had "preliminary discussions" with the prosecutor about Aldava's disposition and was told they could talk after Nino's case was concluded. The prosecutor testified that " 'Aldava's disposition had nothing to do with his testimony in this case. The holding off of his disposition had everything to do with the fact that he couldn't be a convicted felon at the time he testified, which is another form of impeachment.' " (Emphasis omitted.) 279 Ill. App. 3d at 1036. The appellate court, with one judge dissenting, reversed Nino's conviction, concluding that Aldava's attorney and the State had an unspoken agreement. *Nino*, 279 Ill. App. 3d at 1041.

In *Jimerson*, defendant Paula Gray had been convicted, along with defendants Rainge, Williams and Adams, of a double murder and rape. Gray was sentenced to 50 years in prison on the murder and rape counts. The conviction was reversed and Gray became a cooperating witness for the State against a newly charged defendant, Jimerson, as well as Williams and Rainge. On cross-examination by Jimerson's attorney, Gray testified that she had not been promised anything in exchange for her testimony and had not been told that she would get out of jail earlier. At the time of Gray's testimony against Jimerson, the State had filed a discovery answer to Williams' and Rainge's cases revealing that the State had agreed to drop the murder charges if she testified against Williams and Rainge. After testifying against all three defendants, Gray pled guilty to perjury and received two years' probation. The supreme court reversed Jimerson's conviction, holding that Gray's denials of a deal were false and that the failure to inform the defense and the jury of the consideration the witness was to receive violated defendant's right to due process. *Jimerson*, 166 Ill. 2d at 230-31.

Following the reasoning of the above-cited authorities, the State's insistence that it was not required to disclose the promised benefits to

Scales and Bickham cannot be sustained. When the State intends to notify a judge who is to sentence a witness with a pending case of that witness' cooperation, such notification constitutes a benefit to the witness which must be disclosed. This obligation is a continuing one and it is not fulfilled by the State couching its response by saying there is no "deal," "promise" or "agreement" concerning the disposition of the pending charges.

The State contends that, under *Pecoraro,* it did not have to disclose to the jury the fact that the judge sentencing Bickham and Scales would be advised of their cooperation; however, when the State then informs a sentencing court of this type of cooperation from a witness who has criminal charges pending, the purpose of securing beneficial treatment for the witness is patent.[3] The prosecution's obligation to reveal to the jury the existence of an agreement with a witness arises when the witness falsely testifies on the matter. *Pecoraro,* 175 Ill. 2d at 313.

■ The facts and circumstances found in this case amply illustrate a problem faced by prosecutors whenever they call as witnesses persons who are themselves charged with criminal offenses. The facts in the present case as well as those in *Jimerson, Nino, Perkins, Diaz* and *Torres* all involved instances where witnesses had criminal cases pending at some point during the time they were cooperating with the State and were receiving a benefit in one form or another from the State which was not disclosed to the defense. In none of these cases was the nature of the benefit the witness was to receive ever reduced to writing. This is not to imply that the State is endeavoring to hide the material fact of the benefit; rather, the failure to memorialize these benefits makes it much more likely that their existence would not be disclosed (whatever the motivation on the part of the prosecutors involved) and may encourage benefitting witnesses themselves

---

[3]Scales was sentenced to concurrent terms of probation. One was on an unlawful use of weapons charge resulting from an arrest on September 10, 1992. The other was a drug charge resulting from an arrest on January 9, 1993. Section 5—8—4(h) of the Unified Code of Corrections (730 ILCS 5/5—8—4(h) (West 1994)) requires consecutive sentences for offenses committed by a defendant while he is on bond or in custody for another, pending, felony offense. Scales' sentences therefore violate this provision of the Unified Code of Corrections. This type of sentence for witnesses was condemned by this court in *Diaz.* As to Bickham, the State recommended that the court sentence him to six months in jail and one year's probation, terminated satisfactorily *instanter.* Scales and Bickham each had been to the penitentiary for similar offenses in the past. Based on this record, Bickham and Scales clearly received "beneficial treatment" from the State in exchange for their testimony.

later to mischaracterize what they were to receive in consideration for their testimony. The position the State finds itself in regarding these situations can be resolved in the future by the simple expedient of memorializing the benefit the witness is to receive and to reveal such circumstances with candor and alacrity.

The failure to inform defense counsel and the jury violated defendant's due process rights. Notwithstanding the fact that the instant trial and postconviction proceedings concluded prior to the *Olinger, Perkins, Diaz* and *Torres* decisions, which highlighted the problems presented in the case *sub judice, Napue* and *Jimerson* already were in place. The conviction and sentencing appeal in docket No. 1—96—0804 must be reversed and remanded for a new trial. The denial of defendant's postconviction petition in docket No. 1—99—0105 was manifestly erroneous, also warranting a new trial. *People v. Coleman*, 183 Ill. 2d 366, 385, 701 N.E.2d 1063 (1998).

## II

Reversal and remandment are required for additional reasons, emanating from supreme court rule and *Brady* violations, which will be addressed as part of the prosecutorial approach posed by the facts and circumstances of the present case. Supreme Court Rule 412(c) (134 Ill. 2d R. 412(c)) and *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963) *(Brady)*, which Rule 412(c) effectively codifies, must be construed to require the State to disclose the existence of any agreement regarding consideration promised a witness in return for his testimony.

■ A defendant's due process rights are violated under *Brady* where the prosecution suppresses favorable information. *People v. Gray*, 247 Ill. App. 3d 133, 147, 617 N.E.2d 217 (1993). The defense claims that the State violated defendant's due process rights here through the knowing use of false testimony. See *Olinger*, 176 Ill. 2d at 351-52 (considering a *Brady* argument "closely tied" to knowing use of false testimony). The State presented testimony that it knew, or should have known, was false. Under *Brady*, the court reviews the question as whether there is a reasonable likelihood that the false testimony could have affected the jury's decision. *Diaz*, 297 Ill. App. 3d at 370.

In *Diaz*, the State argued that the prosecutors were unaware of a plea agreement because other prosecutors had been involved. This court pointed out "[t]o establish a due process violation, the trial prosecutor need not have known that the testimony was false; it is enough that there was knowledge by representatives or agents of the prosecution" *(Diaz*, 297 Ill. App. 3d at 372), citing *Giglio v. United*

*States,* 405 U.S. 150, 154, 31 L. Ed. 2d 104, 108-09, 92 S. Ct. 763, 766 (1972), and *People v. Brown,* 169 Ill. 2d 94, 660 N.E.2d 964 (1995). Although *Brown* required an allegation of knowing use of false testimony in order to establish a constitutional violation, by its very nature, the existence of an agreement between the State and a cooperating individual as to the disposition of criminal charges must be known to some member of the State (see *Olinger,* for a discussion of agreements between multiple law enforcement jurisdictions). Therefore, assuming *arguendo* that the prosecutors trying the case could prove they were not aware of the agreement or consideration, the knowledge of another State agent nevertheless is imputed to them. This was the factual situation presented in *Giglio* and the same principle applies here with respect to Detective Fiaoni.

The *Diaz* opinion also cited *United States v. Agurs,* 427 U.S. 97, 103, 49 L. Ed. 2d 342, 349-50, 96 S. Ct. 2392, 2397 (1976), and *United States v. Bagley,* 473 U.S. 667, 678, 87 L. Ed. 2d 481, 492, 105 S. Ct. 3375, 3381-82 (1985), with approval, for holding that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Diaz,* 297 Ill. App. 3d at 370. The *Diaz* case further relied upon *Chapman v. California,* 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967), for its holding that the State has the burden of demonstrating beyond a reasonable doubt that the due process violation did not contribute to defendant's conviction, stating "[t]he question is not whether admission of the evidence [regarding consideration] would have more likely than not resulted in a different verdict, but whether, in the absence of the evidence, the defendant received a fair trial, which is a trial resulting in a verdict worthy of confidence." *Diaz,* 297 Ill. App. 3d at 374.

■ A second type of *Brady* violation is claimed to have occurred here also. Prior to trial, the State falsely denied the existence of deals in response to both a written and an oral request as to any promises or agreements made to or with the witnesses. In situations in which the State fails to respond to a specific request, a conviction must be reversed if the suppressed evidence was material in that it might have affected the outcome of trial. *Diaz,* 297 Ill. App. 3d at 370. Here, the jury was presented with potentially false testimony of two alleged eyewitnesses. Clearly, this evidence could have affected the judgment of the jury and the outcome of trial. Reversal and remandment for trial are required for these reasons as well.

### III

Defendant next argues that the circuit court erred when it allowed

the State to introduce improper evidence and argument emphasizing defendant's alleged gang affiliation and other crimes allegedly committed by defendant, designed to inflame the prejudices of the jury, denying him a fair trial and due process of law. Because this issue may again arise at retrial, it will be considered on its merits.

■ Defendant first alleges that, throughout his trial, the State introduced evidence suggesting defendant was a high level gang member with both "rank" and "authority," as well as evidence of other crimes allegedly committed by defendant, including the testimony of Willingham and Butler that defendant boasted about killing others in addition to the victim in this case.

Decisions involving the admissibility of evidence rest within the circuit court's sound discretion and will not be disturbed absent a clear abuse of discretion which results in manifest prejudice. *People v. Lucas*, 151 Ill. 2d 461, 489, 603 N.E.2d 460 (1992). Gang affiliation evidence need not be excluded if it is otherwise relevant and admissible. *People v. Smith*, 141 Ill. 2d 40, 58, 565 N.E.2d 900 (1990) (*Smith*). Evidence indicating a defendant was a gang member or involved in gang-related activity is admissible to show common purpose or design, or to furnish a motive for an otherwise inexplicable act. *Smith*, 141 Ill. 2d at 58. Such evidence is admissible, however, only if sufficient proof reveals that such membership or activity is related to the crime charged. *Smith*, 141 Ill. 2d at 58.

In the instant case, the evidence demonstrates that the victim was shot to death while selling drugs on a street corner in the early morning hours. If not for the testimony of the eyewitnesses, the murder would be inexplicable. Bickham testified that, although he had never met defendant, he knew him from seeing him "around the hood" and from being a rival gang member. Bickham was shocked and scared, and did not tell the police defendant was the shooter until about six months after the murder, because defendant had "rank" or "authority" in the rival gang with which they had problems. Bickham had been selling drugs, as had the victim at the time of the incident. Significantly, on cross-examination, defense counsel asked Bickham if Bickham and defendant were in rival gangs and he replied affirmatively, as he did on direct examination.

Similarly, Scales, on cross-examination at trial, testified that he met defendant at a Gangster Disciples' or "folks'" meeting and that defendant had "rank" in the gang. Scales explained that he delayed identifying defendant as the shooter because he was at large and the witness wanted "nothing to happen to [him]"; he was scared. Also noteworthy is the fact that, in closing argument, defense counsel presented as defense theory that gang members with rank "surround themselves with people" to do the shootings for them.

From the foregoing, it cannot be said that the circuit court abused its discretion in countenancing evidence of defendant's gang affiliation here, since it was relevant to the theories of both the State and the defense. Defendant's reliance upon *People v. Terry*, 312 Ill. App. 3d 984, 728 N.E.2d 669 (2000), is misplaced. In *Terry*, unlike the present case, the sole eyewitness' testimony gave no indication that the murder was gang related, and the evidence of defendant's guilt was not overwhelming.

■ Defendant next claims that the prosecutor improperly and repeatedly emphasized defendant's gang affiliation during closing argument, going so far as to suggest, without supporting evidence, that defendant's motive for killing the victim was gang rivalry and drug competition and that defendant had engaged in witness intimidation.

Defendant's claim is meritless. A prosecutor is given considerable leeway in closing and rebuttal argument and is permitted to argue the evidence, as well as reasonable inferences drawn from that evidence. *People v. Gutirrez*, 205 Ill. App. 3d 231, 261, 564 N.E.2d 850 (1990). The character and scope of closing argument are left largely to the circuit court's discretion and to ensure its proper exercise, every reasonable presumption must be indulged. *People v. Morgan*, 112 Ill. 2d 111, 131, 492 N.E.2d 1303 (1986). Evidence of gangs and gang membership aptly admitted during trial is subject to comment during closing argument. *People v. Nichols*, 235 Ill. App. 3d 499, 507, 601 N.E.2d 1217 (1992). Because the admission of gang affiliation was proper in this case, the prosecutor's remarks were reasonable inferences to be drawn from that evidence.

There was sufficient evidence for the jury to have concluded that defendant was guilty of the crimes charged beyond a reasonable doubt, the reversal here being occasioned by unfair trial proceedings; therefore, no double jeopardy implications arise preventing retrial of this case. *People v. Olivera*, 164 Ill. 2d 382, 393, 647 N.E.2d 926 (1995); *Diaz*, 297 Ill. App. 3d at 374. See *Lockhart v. Nelson*, 488 U.S. 33, 40, 102 L. Ed. 2d 265, 273, 109 S. Ct. 285, 290-91 (1988).

Accordingly, defendant's conviction and sentence, and the circuit court's denial of his postconviction petition, are reversed and the cause is remanded for a new trial.

Reversed and remanded for a new trial.

THEIS, P.J., and GREIMAN, J., concur.