THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. STANLEY FOULES, Defendant-Appellant.

First District (5th Division)    No. 1—92—1648

Opinion filed December 30, 1993.—Rehearing denied February 16, 1994.

Goldman & Marcus, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Susan Schierl, and Annette Collins, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MURRAY delivered the opinion of the court:

After a jury trial, defendant Stanley Foules (Foules) was found guilty of possession of cocaine with the intent to deliver (Ill. Rev. Stat. 1991, ch. 56$^1$/$_2$, par. 1401(a)(2)(A)) and sentenced to 15 years' imprisonment in the Department of Corrections. He now appeals his conviction and sentence, raising a number of issues, including the sufficiency of the evidence. For this reason we provide a detailed accounting of the undisputed evidence presented concerning the events leading to Foules' arrest.

On Thanksgiving Day, November 22, 1990, Chicago police officer Steve Janka and his partner, Linda Gonzales, were assigned to the gang crimes unit. Dressed in plain clothes and driving an unmarked car, they were making a routine patrol of the area around 3500 West Potomac in Chicago when they noticed three men sitting inside a parked car. As they drove past this car they observed two of the men drinking from what they believed to be cans of beer. They decided to make an investigatory stop and drove around the block so that they could approach the vehicle from the rear.

Officer Janka, who was driving the squad car, pulled up behind the parked vehicle and activated the squad car's emergency flashing headlights. He and his partner did not immediately exit the squad car, but instead entered the vehicle's license plate into the LOJAC computer in the squad car.

After a few minutes, he and his partner exited the squad car and approached the parked vehicle. As they did so, they could see through the rear window of the vehicle that the front seat passenger had a scale on his lap and the scale had a purple cup with white powder in it.

As the officers approached, the suspects' vehicle started up and began to speed down the street. The officers ran back to the squad car and began to pursue the fleeing vehicle with their lights and siren activated. They had the vehicle in sight at all times and noticed that as the vehicle turned the corner onto St. Louis and passed an alleyway, the front seat passenger threw something purple in color from the window, accompanied by a puff of white powdery "smoke."

As the cars approached the intersection of St. Louis and Evergreen, the squad car overtook the suspects' vehicle and forced it to the side of the road by cutting into its path. Both officers jumped from their squad car and approached the vehicle. Officer Janka, who approached the driver's side of the vehicle, noticed that the driver appeared to be placing the vehicle in reverse, attempting to back up. Officer Janka smashed his flashlight through the driver's side window and the vehicle then came to a stop. Officer Janka ordered the driver from the car and, when he refused, assisted him from the vehicle, handcuffed him and placed him in the street. He then ordered the rear seat passenger from the car and handcuffed him as well.

Officer Gonzales approached the passenger side of the car. She ordered the front seat passenger, who was Foules, from the car.

Foules informed her, however, that he could not get out of the car because he was a paraplegic.[1]

Both Officer Gonzales and Officer Janka reported seeing a white powdery substance covering defendant's clothes and the interior of the car near the passenger side window. In addition, Officer Gonzales found parts of a gram scale in defendant's lap and retrieved a black vinyl bag from defendant. She described this bag as one that could be attached to the back of a wheel chair. Both officers testified that Foules had positioned this bag on his lap as a table when using the scale and that Foules had the bag between his legs when he was arrested. Inside this bag the officers found another gram scale, a bottle of mannitol, a pair of scissors, a plastic tube which contained a white powder residue, and a plastic bag containing a white powdery substance. Officer Janka also testified that they recovered from this bag $458, consisting of four $20 bills, one $10 bill, 73 $5 bills and three $1 bills.[2]

Officer Gonzales radioed for back-up assistance and other police officers soon arrived on the scene. When more officers arrived, Officer Janka walked back down the street and retrieved the purple cup from the scale that had been thrown out the window of the car during the chase.

The two suspects who had been removed from the car were transported to the fourteenth district police station. Defendant Foules remained in the vehicle, however, despite attempts to assist him into his wheel chair, which had been in the rear of the car. Foules insisted he needed medical assistance to exit the vehicle. He was allowed to call his doctor using a portable telephone he had in his possession, but he was unable to contact him.

Because Foules refused to move, it was decided that Foules would be transported to the police station inside the vehicle where he was sitting and an officer was assigned to drive him. At the police station Foules continued to refuse to leave the vehicle, even when a paramedic team was called to assist. Finally, because more than two hours had passed since his arrest, he was lifted from the vehicle by a police sergeant, despite his protests. After his removal from the vehicle the police searched the interior of the car and recovered a loaded

---

[1]Defendant Foules, who was born in 1956, became a paraplegic from the chest down in November 1979 as a result of a gunshot wound to the spine area.

[2]Although Officer Janka testified that this currency was recovered from Foules' bag, the money was not produced as evidence in court. Officer Janka testified that the money was not needed as evidence and so it was inventoried and then placed in the bank by the police.

.22-caliber revolver under the front passenger side seat, where Foules had been sitting.

Lastly, Officer Gonzales testified that when questioning Foules at the police station he indicated that he used cocaine for "medicinal purposes" due to the back pain he experienced because of his paraplegia.

Grace Odibo, a chemist for the Chicago police crime lab, testified that she tested a residue that was on the "purple cup" that Officer Janka had testified he saw being thrown from the window of the car and which he later recovered. This residue tested positive for cocaine.

Marsha Ross, another chemist for the Chicago police crime lab, testified that the plastic bag recovered from Foules contained 18.86 grams of a substance containing cocaine.

Lastly, the State presented Chicago police officer Albert Taylor, who was qualified as an expert due to his experience as an undercover narcotics officer. He testified that the street value of one gram of cocaine was between $50 and $60 and that it is generally sold in "nickel bags," so called because they cost $5, or "dime bags," which cost $10. The "nickel bags" contain about one-tenth of a gram of cocaine, whereas "dime bags" contain twice that amount, i.e., two-tenths of a gram of cocaine. Officer Taylor also testified that mannitol is used to "cut" the cocaine, i.e., added to cocaine to lower its purity. He identified the tube-like item found in Foules' bag as an "eye dropper" used to "pull up the cocaine into the cylinder" so it could be dispensed onto the scale. He testified that the top from the tube could also be removed and the item used to "snort" cocaine.

After this evidence was presented, the State rested and the defense presented its witnesses. The first defense witness was Sidney Thompson (Thompson). He testified that he had known Foules for more than 20 years and that on November 22, 1990, Foules had come to his house to visit him. Although Foules was supposed to be a family friend, Foules did not speak with any other member of Thompson's family who had gathered at his house for Thanksgiving.

Thompson testified that when Foules arrived in Michael Lee's car, Thompson got into the back seat and they drove away. Thompson explained that they left the area because there was limited parking on his street and because his children were playing in the yard and he wanted to get away to "get some air" and to sit and "conversate" and reminisce.

Thompson stated that, after a few minutes of talking, they decided to leave the area, with no destination in mind. Lee pulled the car away from the curb and the next thing they knew a car cut them off and two people (a man and a woman) carrying guns jumped out of a

car screaming "Freeze, don't move." He claimed that Lee inadvertently let the car begin to roll backward. The man then rammed his gun through the driver's side window, smashing it. The man then dragged Lee from the driver's seat.

Thompson exited the car shortly after and was handcuffed and told to kneel down in the street. He was later taken to the police station.

On cross-examination, Thompson denied that he ever saw the squad car prior to it cutting them off, he denied drinking beer, and denied that Foules had a scale containing cocaine in his lap. He claimed that he had been drinking Pepsi and that they pulled away from the curb unaware of the squad car behind them.

The next witness was Saul James (James), who was also a paraplegic and a friend of Foules. He testified that the gun, which was recovered by police from under the seat of Lee's car when Foules was arrested, belonged to him. He indicated that Lee was a friend of his who often drove him around so he could do errands. On the day before Thanksgiving, November 21, 1990, Lee had driven him to a target shooting range called "Bell's." After target shooting for about an hour, Lee picked him up and James placed the gun under the seat. Because James was going to his girlfriend's home, he did not want to take the gun with him. Instead, he left the gun under the seat and asked Lee to take the gun to his mother's house for him.

Foules then testified on his own behalf. He stated that on the morning of Thanksgiving day, November 1990, his wife had gone to her sister's to help prepare the holiday meal. Michael Lee came to his house in the afternoon to drive him to his sister-in-law's for dinner. On the way to his sister-in-law's house, Foules decided to visit Sidney Thompson, an old friend.

When they stopped at Thompson's home, Sidney came to the car and got in because Foules could not climb stairs to go inside. They drove to another street and parked because the parking near Thompson's home was crowded. Additionally, Foules testified that, after sitting in the car and talking for about five minutes, Sidney had to get back to his family. Therefore, they pulled away from their parked position to drive Sidney back home. Then, without warning, a car pulled in front of them and cut them off. Two people, a man and a woman, exited the car with guns drawn and approached their car. The man, without provocation, smashed the driver's side window with his gun.

Foules denied owning a black bag or a scale and claimed that he could not balance anything on his lap because he suffers from spastic muscle spasms due to his paraplegia. He denied ever seeing any of

the drug-related paraphernalia recovered by the police or the gun found under the seat. He claimed that he did not own a gun and that he was afraid of guns. He admitted that he would not exit the car although requested to by police, but claimed that he refused to leave the car out of fear of being beaten or abused at the hands of the police officers. When asked why he continued to refuse to leave the vehicle after he arrived at the police station, where there were many officers and paramedics, he stated that he has brittle bone disease and feared receiving a broken bone.

After all of the above evidence was heard and the jury was instructed, the jury returned a verdict of guilty of possession of cocaine with the intent to deliver. Foules was later sentenced to 15 years' imprisonment and he now brings this timely appeal.

The first issue raised by Foules is the sufficiency of the evidence. Foules contends that the State failed to prove him guilty beyond a reasonable doubt of the crime of possession of cocaine with the intent to deliver because the State's version of the events leading to his arrest was inherently improbable, unsatisfactory, unconvincing and contrary to human experience. He cites one case for this proposition, *People v. Gordon* (1990), 204 Ill. App. 3d 123, 561 N.E.2d 1164. Foules also contends that the State failed to show that the amount of cocaine recovered was inconsistent with personal consumption and cites a number of cases wherein the amount of drugs recovered was much greater. He concludes that his conviction for possession of cocaine with the intent to deliver should be reversed.

Initially we note that, for the most part, Foules' argument concerning the sufficiency of the evidence does not call into question the legal sufficiency of the evidence, as was the case in *Gordon*. In *Gordon*, the reviewing court overturned the defendant's conviction for possession of a stolen motor vehicle because the evidence, even when viewed in a light most favorable to the prosecution, failed to establish that the defendant knowingly possessed a stolen motor vehicle.

In the present case, however, Foules questions the credibility of the arresting officers. Furthermore, argument on the issue of sufficiency of the evidence is based almost entirely on conjecture and assumption regarding the conditions at the time of the arrest. For example, Foules contends that the officers' testimony was inherently unreliable in that: (1) it was improbable that the officers, when passing the parked vehicle, were going slow enough to have seen and identified cans of beer being consumed by the occupants of the parked car; (2) if the officers were driving slow enough to see beer cans, it would have been easier, and more likely, that they would have stopped their squad car and backed up to investigate the situation,

rather than drive around the block to approach from the rear; (3) when, according to their testimony, the officers pulled up behind the parked vehicle and approached it, it would have been impossible for them to see a scale and white powder on Foules' lap because they did not have an unobstructed view; (4) because the vehicle sped off when the officers were approaching it, they would not have been able to return to their squad car and overtake the fleeing vehicle within a few blocks, as they testified; (5) in light of the speed that the cars must have been traveling, it is unlikely that either officer could see something being thrown from the vehicle, especially something as small as a scale part; (6) due to the configuration of the passengers in the fleeing car, Officer Janka would not have had an unobstructed view to see Foules throw anything from the vehicle; (7) because the streets were "residential," it is improbable that there was room for the squad car to pass the fleeing vehicle without hitting the fleeing vehicle, an oncoming vehicle or a parked car; (8) it is incredible to believe that Officer Janka was able to locate the small scale part and that he did not "preserve" this evidence for fingerprint analysis; (9) if Foules threw some cocaine out the window, he would have been "dim-witted" to have not also thrown away the bag of cocaine that was, according to police testimony, recovered from Foules' bag and thus the officers' testimony that a bag of cocaine was recovered was contrary to human experience; (10) it is unbelievable that, if the beer cans and white powder residue were actually present in the vehicle, the police would not have photographed the vehicle to show that they were there; and (11) it is incredible that the police did not confiscate Lee's vehicle and that they did not confiscate, inventory and fingerprint Foules' black bag wherein the drugs and drug paraphernalia were discovered. In essence, Foules contends that there was no probable cause for the police to have stopped the car in which he was a passenger, that there were no drugs or drug paraphernalia present in the vehicle and that the Chicago police officers who testified to the contrary, without any known motive or reason, perpetrated a fraud against Foules and the court.

There is no question, as defendant asserts, that a conviction must be based upon proof beyond a reasonable doubt and that such proof cannot be unconvincing, improbable or contrary to human experience. (*People v. Molstad* (1984), 101 Ill. 2d 128, 461 N.E.2d 398.) However, the reviewing court's duty is not to ask itself whether *it* believes the evidence establishes guilt, but whether the evidence viewed in a light most favorable to the prosecution would allow any rational trier of fact to find the essential elements of the crime proved beyond a reasonable doubt. (*Jackson v. Virginia* (1979), 443 U.S. 307,

61 L. Ed. 2d 560, 99 S. Ct. 2781; *People v. Collins* (1985), 106 Ill. 2d 237, 487 N.E.2d 267.) This standard of review preserves the jury's function of weighing the evidence and resolving all conflicts in testimony. For this reason, too, a court of review may not consider any evidence not of record.

■ It is clear to this court, upon a review of all the evidence, that if the arresting officers are to be believed, there was more than sufficient evidence to support the conviction. In addition, we find nothing in the record to persuade us that the officers' credibility should be impugned. We believe that rational triers of fact could have resolved the conflicts in testimony in the prosecution's favor and that the evidence was not so unreasonable or unsatisfactory that it raises a doubt of defendant's guilt. We find nothing inherently improbable about anything that the officers testified to. In fact, if we were weighing the credibility of the State's case versus the defense case, we would resolve the conflicts in the same way the jury did. Consequently, we affirm Foules' conviction.

Foules next contends that the amount of cocaine found to be in his possession was not inconsistent with personal use and, for this reason, the element of "intent to deliver" was not established. He cites to a number of cases wherein the intent to deliver element was inferred from the presence of quantities of controlled substances much greater than the 18.86 grams of cocaine found in this case. Another factor considered in some of the cited cases to imply intent to deliver was the presence of multiple types of controlled substances, a circumstance not found in the present case. Foules concludes that there was insufficient evidence to show intent in this case. We disagree.

Although a reasonable inference of intent to deliver may be drawn from the fact that the quantity of drugs found is inconsistent with personal use (*People v. Robinson* (1992), 233 Ill. App. 3d 278, 598 N.E.2d 1348), the fact that the quantity of drugs is relatively small will not negate the element of intent to deliver. (See *People v. Berry* (1990), 198 Ill. App. 3d 24, 555 N.E.2d 434 (3.9 grams of cocaine); *People v. LeCour* (1988), 172 Ill. App. 3d 878, 527 N.E.2d 125 (3.3 grams of cocaine); *People v. Marshall* (1988), 165 Ill. App. 3d 968, 521 N.E.2d 538 (13.88 grams of cocaine).) Inferences may also be drawn from the overall circumstances, including such factors as the presence of drug paraphernalia, cash and weapons.

■ In the present case 18.86 grams of cocaine were recovered. Although this may not seem like a large quantity of drugs, testimony revealed that cocaine is generally sold in tenths of a gram. Furthermore, according to the testimony of the arresting officers, an un-

known additional amount of cocaine was thrown from the window of the car. Therefore, a much larger quantity of cocaine may have been involved. Additionally, two separate gram scales, a bottle of mannitol (used to "cut" cocaine), an unusually large number of $5 bills and a gun were also recovered. We believe that the presence of these items provided a sufficient basis from which the jury could infer that Foules possessed the intent to deliver cocaine.

Next Foules contends that this was a "close case" based upon the conflicting testimony and that, for this reason, certain trial errors which occurred were so prejudicial that he was denied a fair trial. Again, we must disagree. We do not find the evidence in this case to be closely balanced, nor do we find that any of the alleged errors, even if error, warrant reversal.

The errors that are alleged to have occurred during trial are: (1) an improper comment of the trial court which denigrated defense counsel; (2) the incomplete impeachment of defense witness Saul James; (3) the court's refusal to *voir dire* the jury using certain questions submitted by defense counsel; and (4) the court's improper qualification of a State witness as an expert. We shall address each claim individually.

The first alleged error, the improper comment of the trial court, occurred when defense counsel attempted to impeach Officer Janka's in-court identification of Foules. Officer Janka pointed to Foules and described him as wearing a white shirt. Defense counsel then asked the court to have the record reflect that Foules was wearing a purple shirt. The court responded:

> "Record will indicate that if its purple, its awful [*sic*] light, because it looks white to me.
>
> So, I don't know that the record can reflect it's purple. The jury sees the shirt. The jury will make their own determination as to what color the shirt is."

It is Foules' position on appeal that the comment was improper, not only because the court placed its own opinion before the jury, but also because the court "denigrated" defense counsel in the eyes of the jury by contradicting him.

It is certainly true that a judge must be ever watchful of his conduct during a trial. Every defendant is entitled to an unbiased, open-minded trier of fact and a judge's slightest show of deference to the State could prejudice a defendant. (*People v. Eckert* (1990), 194 Ill. App. 3d 667, 551 N.E.2d 820.) We do not believe, however, that the court's comment regarding the defendant's shirt color was the type of egregious show of hostility toward defendant or defense counsel that would warrant a finding that defendant was denied a fair trial.

Furthermore, while it may be true that the trial court should not have stated its own belief concerning the color of defendant's shirt, any possible error associated with this comment was immediately rectified by the court's subsequent comments concerning the jury's role in assessing the evidence and making its own determination regarding the shirt color. The court's subsequent statement eliminated any show of partiality toward the State in deference to the defendant. Thus, we find that the court's brief comment, given in response to defense counsel's request to have the record reflect a certain circumstance which was not readily apparent, if error at all, did not constitute prejudicial error requiring reversal.

We note, too, that Foules' identification was not ever in dispute. Thus, Officer Janka's in-court identification of Foules by his shirt color, at best, was a collateral matter which went to the issue of Officer Janka's powers of perception. Although defense counsel may have wished to demonstrate to the jury that the witness' ability to perceive color at a distance was poor, whether or not he was able to take full advantage of this opportunity did not affect the case in any appreciable way. Therefore, there was no real prejudice to the defendant.

The next claimed error concerns the State's impeachment of defense witness Saul James. During cross-examination the prosecutor discussed the fact that, prior to trial that day, the prosecutor had spoken with James to discover what the gist of his testimony would be. The following colloquy was then had:

"Q. [Prosecutor:] And I asked you what you were going to testify to?

A. [James:] Yes.

Q. And you said you hadn't decided?

A. I did not say that. No. I did not say that.

Q. You said you had to talk to the attorney because—

A. No. I didn't say that. I didn't say that. I didn't say that. I didn't say that. I told you that I don't know what I'm going to testify to because I have not heard the questions, which I hadn't heard the questions.

Q. And then you said you would know after you talked to the attorney; is that what you said?

A. No. You said that. You said you had to talk to the attorney. He came back and I asked you, hope I didn't offend you. I apologized.

Q. But you did say in the presence of his attorney and myself and my partner you had to talk to the attorney and then you would know what you're going to testify.

A. I didn't say that. No. I did not—I did not say that. I did not say that."

The matter was then dropped and no further reference was made to the witness' comments.

Foules now claims that these questions were improper cross-examination because the impeachment was never perfected by the introduction of evidence to the contrary. We note, however, that these questions were never objected to at trial and, therefore, any error may be deemed waived. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) Even if this issue is not waived, we find no prejudicial error.

It is true that, as stated in the cases cited to by defendant, trial by insinuation and innuendo is improper. The State may not ask leading questions calculated to impeach a witness by assuming facts not in evidence, unless the State has evidence to substantiate the inquiry. (*People v. Robinson* (1989), 189 Ill. App. 3d 323, 545 N.E.2d 268; *People v. Rivera* (1986), 145 Ill. App. 3d 609, 495 N.E.2d 1088.) The error may be compounded where, as in both of the above-cited cases, the State relies upon the insinuation as actual proof in closing argument.

■ This was not the case here. Although the prosecutor did not call another witness to perfect the impeachment, substantiation for the prosecutor's attempt to impeach the witness was the fact that it was based upon the prosecutor's own conversation with the witness just prior to his testifying. In addition, the prosecutor did not argue any insinuation or innuendo related to this matter as if it were fact in closing argument.

Furthermore, Saul James' testimony concerned the ownership of the gun. Whether or not the witness owned the gun found near Foules in the car was really collateral to the issue of defendant's guilt for the crime charged. Therefore, we do not believe any error associated with the cited questioning of this witness improperly prejudiced defendant in this case.

Foules also contends that, in addition to being improper impeachment, the questions were error because they impugned the integrity of defense counsel. We note, however, that the prosecutor's questions never directly implicated defense counsel. Nor did the prosecutor argue that defense counsel had solicited false information. This was not the type of hubristic behavior that was sanctioned in *People v. Larry* (1991), 218 Ill. App. 3d 658, 578 N.E.2d 1069, and *People v. Hovanec* (1976), 40 Ill. App. 3d 15, 351 N.E.2d 402, the cases cited by defendant in support of his claim. Therefore, we do not find that defendant's case was unduly harmed by a remote inference that the witness was going to be coached by defense counsel, a circumstance flatly denied by the witness.

Next Foules claims that the prosecutor repeatedly asked improper questions which necessitated his attorney to object, thereby causing the defense attorney to look "obstreperous." Our review of the record evidences no such tactic on the part of the prosecutor. We see no indication that any of the questions asked by the prosecutor were part of a plot to abase defendant or his counsel. Furthermore, as defendant himself notes, there is no error unless the prosecutor's behavior contributed to the conviction. The record shows that this case is vastly different from the *Hovanec* case cited by defendant, where the prosecutor repeatedly asked clearly objectionable questions to which the court had already sustained objections. (See *Hovanec*, 40 Ill. App. 3d at 17.) There is no question in this court's mind that the fact that defense counsel was required to object to certain questions did not in any way contribute to defendant's conviction.

Next defendant contends that he was denied a fair trial because the court refused to ask prospective jurors certain questions that had been submitted by defense counsel. Those questions include the following:

(1) "Do you believe that because a person is a State's Attorney or a police officer, he or she is more likely to tell the truth?"

(2) "Do you have any strong feelings about the criminal justice system? (a.) What are those feelings? (b.) Would they interfere with an impartial deliberation of the facts of this case?"

(3) "Do you believe that because STANLEY FOULES is the defendant in this case, he must be guilty of something or else he wouldn't be here?"

(4) "Do you understand that, as a juror, your task is not to determine whether Stanley Foules is innocent, but whether the prosecution has proven him guilty beyond all reasonable doubt? And if they have not, you must vote not guilty? (a.) Do you understand all the elements of a crime charged must be proven beyond all reasonable doubt, and that if even one element of a crime was not proved, you must vote not guilty? (b.) Do you understand that the counts of an indictment are separate charges, and that the prosecution must prove all the elements of each one beyond a reasonable doubt, so that it is possible that you may reach different verdicts on different counts?"

(5) "Do you understand that an impartial trial by an unbiased jury is a constitutional guarantee, no matter what the charges are against the defendant? (a.) Knowing the charges against STANLEY FOULES could you give him the same fair trial that you would if he were charged with a lesser crime?"

(6) "Have you had any experiences with black people that might affect your judgment?"

The court refused to ask these questions, stating that some were already covered in the court's own questioning, some were too vague, and some were matters to be covered at instruction.

As stated in *People v. DeSavieu* (1983), 120 Ill. App. 3d 420, 458 N.E.2d 504, it is within the court's discretion to choose whether or not it will examine the venire using supplemental questions submitted by the parties. As long as the questions posed by the court are reasonably calculated to discover a juror's partialities or prejudices, if present, there will be no error in refusing to ask specific supplemental questions.

■ Due to the above-stated standard for review, it is impossible to determine whether error occurred merely by listing the rejected questions. Whether a specific question was an appropriate one that may have helped reveal latent prejudices is not the issue. The question is whether the *voir dire* that was conducted was sufficiently thorough to allow the defendant to discover any biases a prospective juror might have had.

In this case, the court asked the venire questions about their family and work situations, about any connections they might have had with police officers or attorneys, and whether they felt that they could be fair and impartial. We believe that the *voir dire* that was conducted was sufficient to reveal any prejudices that the jurors might have harbored. Since defendant does not complain that the selected jurors showed any partiality or exhibited any prejudice, and we can find no evidence of juror prejudice or partiality contained within the record, we see no reason to find that the court abused its discretion by refusing to ask particular questions that were submitted by Foules. We note here that Foules, though charged with armed violence in addition to the drug charge, was acquitted of the weapons charge by this same jury.

Next Foules contends that Chicago police officer Albert Taylor should not have been qualified as an expert. Foules bases this claim on the fact that Taylor could not remember the name of the judge in any of the four cases wherein he was previously qualified as an expert. Foules argues that the officer's failed memory on this matter "shielded" him from an investigation of his credentials and, thus, removed an "effective tool of cross-examination." He further contends that this witness violated the court's protective orders by testifying to certain things which the court had already told the State to avoid.

We note first that Foules does not contend that Taylor was not qualified to be an expert by virtue of his knowledge and expertise. He contends only that Taylor, who was allowed to bolster his veracity by informing the jury that he had been qualified as an expert on a

previous occasion, was not susceptible to impeachment on that one issue. However, that is not the standard by which a witness is qualified as an expert. A person may be qualified as an expert if he or she possesses certain knowledge that the ordinary person would not and the court finds that this knowledge would assist the triers of fact in understanding the evidence and ruling on the matters at issue. (*People v. Enis* (1990), 139 Ill. 2d 264, 564 N.E.2d 1155.) The use of narcotics and the behaviors of narcotics users and dealers are not thought to be within the common experience of the ordinary person (*People v. King* (1991), 218 Ill. App. 3d 248, 578 N.E.2d 217), and police officers having experience in dealing with narcotics may be qualified as experts. *People v. Abdelmassih* (1991), 217 Ill. App. 3d 544, 577 N.E.2d 861.

In the present case, the trial court considered the arguments of defense counsel against qualifying Taylor as an expert, including the fact that he could not recall the specifics of the times when he had previously been qualified as an expert. Nevertheless, the court found that the officer's $11^1/_2$ years' experience, his engagement in undercover narcotics police work, and his general knowledge on the subject matter qualified him as an expert. We do not believe that the court abused its discretion in this respect.

Concerning Foules' claim that Taylor's testimony exceeded the bounds previously set by the court, we note that in each instance where Foules contends that the witness overstepped the limits set by the court, the court overruled objections made by defense counsel. We can only conclude that the court did not feel that its order was not being complied with. Furthermore, our own review of this witness' testimony does not indicate that the State engaged in purposeful disregard of the directive of the court. Therefore, we find no error.

The final issue raised by defendant concerns the length of his sentence. The statute which Foules was found to have violated provides for a mandatory sentence between 6 and 30 years for the possession of more than 15 grams, but less than 100 grams, of cocaine. (Ill. Rev. Stat. 1991, ch. $56^1/_2$, par. 1401(a)(2)(A).) Foules, who was sentenced to 15 years' imprisonment, contends that the sentence he received was excessive in light of the fact that he possessed only 18.6 grams of cocaine. Using a ratio analysis, he asks that the length of his sentence be determined as a percentage of the available term, in direct corollary to the amount of drugs he possessed. That is, since 18.86 grams is 18.86% of the 100 grams of cocaine he could have possessed within this sentencing category, his sentence should be 18.86% of the longest term available within this sentencing category,

*i.e.*, 30 years. He concludes that he should have been sentenced to the minimum sentence of six years.

■ We do not think that the amount of drugs, alone, should be determinative of the sentence received. Furthermore, it has long been held that, where a sentence falls within the parameters prescribed by the legislature, the sentence should not be disturbed on the basis that it is excessive, unless it is " 'greatly at variance with the purpose and spirit of the law or manifestly in excess of the proscriptions of section 11 of article II of the [1870] Illinois constitution which requires that all penalties should be proportioned to the nature of the offense.' " (*People v. Cabrera* (1987), 116 Ill. 2d 474, 493-94, 508 N.E.2d 708, quoting *People v. Barrios* (1986), 114 Ill. 2d 265, 277, 500 N.E.2d 415.) Our review is limited to a determination of whether the trial court abused its discretion in setting an appropriate sentence. *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.

There is no question that the trial court here considered all of the appropriate factors in aggravation and mitigation. The fact that this court might have balanced these factors differently is not grounds for overturning the sentence imposed. (*People v. Coleman* (1991), 222 Ill. App. 3d 614, 584 N.E.2d 330.) Accordingly, we may not disturb the sentence handed down by the trial court.

The conviction and sentence entered against defendant Stanley Foules is hereby affirmed.

Affirmed.

GORDON, P.J., and COUSINS, J., concur.