THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SAMUEL DIAZ, Defendant-Appellant.

First District (4th Division)   No. 1—95—4273

Opinion filed June 11, 1998.

Thomas Peters, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and John J. Walters, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE CERDA delivered the opinion of the court:
Following a jury trial, defendant, Samuel Diaz, was convicted of possession of a controlled substance with intent to deliver (720 ILCS 570/401(c)(2) (West 1994)), unauthorized delivery of contraband in a penal institution by an employee (720 ILCS 5/31A—1.2(c)(2) (West 1994)), and official misconduct (720 ILCS 5/33—3(c) (West 1994)). He was sentenced to 10 years' imprisonment for the unauthorized delivery of contraband in a penal institution by an employee. On appeal, defen-

dant asserts that (1) there was insufficient evidence to convict him; (2) the State violated *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963), in that it withheld evidence that its main witness received a greatly reduced sentence in exchange for his testimony; and (3) the State allowed perjured testimony from its main witness to go uncorrected. For the following reasons, we reverse.

Cook County Deputy Sheriff Maria Johnson testified that she had a conversation with George Muriel, an inmate at Cook County jail, at 3:15 p.m. on January 4, 1994. Muriel told her that defendant, a lieutenant at the jail, was willing to bring cocaine into the jail for $100. Johnson, who was assigned to the sheriff's criminal corruption unit, instructed Muriel to give defendant her pager number and her code name, Rosa.

At 5:46 p.m., Johnson received a page. When she returned the call, defendant answered the telephone and asked Johnson whether the food was ready. Johnson responded that it was not a matter of food. Defendant acknowledged that he knew it was not food, but did not want to talk about it over the phone. There was a disagreement about the amount of money defendant was charging, so defendant told Johnson that he would call her back. Ten minutes later, Johnson was again paged from the same number. She called defendant, who put Muriel on the phone. After Muriel told Johnson that the amount was $175, defendant spoke with Johnson. He offered to meet Johnson at a restaurant, but she refused because the price had gone up $75. Muriel got back on the phone and told Johnson to page defendant when she was ready.

On January 10, 1994, at 9:58 p.m., Johnson received a page. When she called the number, defendant answered the phone, identifying himself as Lt. Diaz. Defendant asked Johnson whether the package was ready. Because Johnson had not yet obtained court authorization to record conversations with defendant, she told him she was upset with Muriel and was not sure that Muriel would get his cocaine and defendant his money. Defendant admonished her not to talk about those things on the phone.

Two days later, Johnson obtained a court order allowing her to record conversations between herself and defendant until January 22, 1994, but defendant was absent from work from January 16 until January 23 due to a death in his family. When Johnson spoke with Muriel on January 24, 1994, he said that defendant was back at work and was willing to take $100 to bring cocaine into the jail. The next day, Johnson obtained another court order to record conversations with defendant.

On January 26, 1994, at 4:15 p.m., Johnson received a page. She

returned the call from the State's Attorney's office and activated a tape recorder. After defendant identified himself, Johnson spoke with Muriel, who told her in Spanish that the purpose of defendant's call was to ask "if the stuff was ready." Further, Muriel told Johnson that defendant wanted to be called Pito rather than his real name.

Defendant then spoke to Johnson in Spanish. After agreeing on a price of $100, they agreed Johnson would page Diaz before 3 p.m. the next day. An audiotape of the conversation was played for the jury.

The next day at 11:41 a.m., Johnson dialed defendant's pager number. When he returned the call, they agreed to meet at a restaurant at 2:30 p.m. Johnson asked if defendant "would take care of the white stuff," but defendant replied that he did not like to talk about that over the phone. He advised her to come alone and described his car. An audiotape of that conversation was played for the jury.

After the conversation, Johnson obtained and photocopied five $20 bills with clearly legible serial numbers as well as cocaine supplied by the State's Attorney's office. She did not weigh the cocaine before placing it in a small clear plastic baggie, knotting and burning the end, and placing a small red mark near the burn mark.

Johnson and four other officers went to the restaurant, but she received a page from defendant at 2:10 p.m. Defendant changed the meeting place to a Walgreen's parking lot near 26th and Albany Streets. An audiotape of that conversation was played for the jury.

At the Walgreen's parking lot, when Johnson saw defendant's car, she approached defendant and asked if he were Pito. After Johnson got into defendant's car, defendant asked her for identification so that he could be sure she was not a drug enforcement agent. Without showing any identification, Johnson gave defendant the $100 and the cocaine. At trial, she identified the bag, with the red mark, that she had given defendant. Defendant put the cocaine in his pocket and told Johnson that Muriel would get the cocaine that day. An audiotape of that conversation was played for the jury.

At 9:30 a.m. on January 28, 1994, State's Attorney Investigator Robert Sullivan, an investigator in the internal affairs division of the Cook County jail, gave Johnson the package of cocaine he received from Muriel. Johnson identified the package as the same sealed bag that she had given defendant. Sgt. James Houlihan, commander of the criminal corruption unit of the Cook County sheriff's department, testified that he was present in the State's Attorney's office on January 13, 1994, when Assistant State's Attorney Christopher Donnelly took a plastic bag of cocaine from the office's narcotics vault, opened it, poured half a baggie full of the cocaine, and gave it to Johnson, who put a marble-sized amount of cocaine into a baggie, then knotted and

burned the end. Sgt. Houlihan then went with other surveillance officers to the Walgreen's parking lot, where he saw Johnson meet with defendant.

George Muriel testified that he contacted Johnson, whom he knew as Rosa, at 3:15 p.m. on January 4, 1994, and told her that defendant was willing to bring cocaine into the jail for $175. Muriel's testimony about the events from January 4 until January 26, 1994, was substantially the same as Johnson's testimony. Further, Muriel stated that he was called to defendant's office between 5 and 5:30 p.m. on January 27, 1994. After he sat down, defendant tossed him a pack of cigarettes and said, "I take care of my business." When he returned to his cell, he opened the pack and pulled out some cigarettes. The cigarettes were chopped off and the cigarette box contained cocaine in a plastic bag, which was tied, with the tip burned to seal it. Muriel identified the bag in court. He tried to contact Investigator Robert Sullivan that night, but there was no answer in his office, so Muriel contacted Sullivan the next morning. Muriel denied opening the bag or doing anything to the cocaine while it was in his possession. He also stated that he received no promises for his testimony.

The parties stipulated that Chicago police department chemist Linda Jenkins tested 4,839.67 grams of cocaine on February 22, 1989, and that the cocaine remained in the proper custody of the State's Attorney's office until it was withdrawn on January 27, 1994. There was a further stipulation to the chain of custody of the package from the time Muriel gave it to Investigator Sullivan. The package was tested by Illinois State Police chemist Fella Johnson, who determined that it contained 1.5 grams of cocaine. It was also stipulated that defendant was a public employee on January 27, 1994.

In his defense, defendant testified that Muriel asked him on January 4, 1994, if he would bring drugs into the jail. Even though he had no intention of doing so, he told Muriel he would think about it. Defendant explained that he wanted to conduct his own investigation. The inmates were angry with him because they thought he had authorized food containing drugs to come into the jail, then ordered the food thrown away.

On January 24, 1994, Muriel told defendant that a large quantity of drugs would be dropped off in front of division 6 next to a flower bed. He asked defendant to bring the drugs into the jail and Muriel would pay him after he distributed the drugs. At 7:30 p.m., defendant went outside, picked up a plastic Coca-Cola cup, brought it inside, called Captain Davis, and opened the package in Davis's presence. The package contained six Ziplock bags of suspected crack cocaine, five yellow envelopes of suspected marijuana, three red and gray capsules,

and three white tablets. The captain instructed defendant to take the drugs to the division chief's office. At trial, defendant produced a copy of the narcotics logbook, which contained an inventory of the confiscated drugs undersigned by Chief Holly.

When Muriel approached defendant on January 26, 1994, and said that his girlfriend was ready, defendant agreed to meet Rosa. Defendant admitted meeting Johnson and receiving five $20 bills and a clear plastic bag containing white powder, but he claimed he was only doing his job because he was conducting his own investigation. However, he never told anyone of that investigation. Further, he denied giving Muriel a cigarette package or any drugs and claimed that he destroyed the plastic bag and changed the bills at a currency exchange.

After deliberations, the jury convicted defendant of unauthorized delivery of contraband in a penal institution by an employee, official misconduct, and possession of a controlled substance with the intent to deliver. The trial court denied defendant's motion for a new trial, which was based on the following notes in the State's files. The first note stated:

"3-4-94 Gaughan (c) i/c BA 3/14/94 PG/?FG 6 yrs conc. to 93—9338. As Class X per Wayne Meyer ok to concurrent (△ worked as informant for Public Integrity)"

The second note read:

"3-4-94 Gaughan (c) i/c BA 3/14/94 per Wayne Meyer—6 yrs. DOC case. on both cases 230 days TCS. per Wayne Meyer ok to run concurrent on 93—16315 b/c △ worked as informant for public Integrity PG/?FG 6 yrs DOC conc to 93—16315 As Class X."

The trial court found that the jury had sufficient information, along with the jury instruction, that Muriel had acted with a view toward obtaining some benefit so that the jury could have discounted his testimony had it chosen to do so. The trial court then sentenced defendant to 10 years' imprisonment.

■ Defendant first contends that the State failed to prove him guilty beyond a reasonable doubt. He argues that the State's case was based almost entirely on the inherently unreliable and uncorroborated testimony of George Muriel, who was not credible because he is a convicted felon and a drug addict, and that his testimony was "fanciful and bizarre." Defendant also asserts that there was no independent corroboration that he delivered the cocaine to Muriel.

Defendant correctly states that testimony by an informant who himself abuses unlawful substances and who participates in an undercover operation to minimize punishment for his own illegal activity should be closely scrutinized. *People v. Anders*, 228 Ill. App. 3d 456, 464, 592 N.E.2d 652 (1992). However, there was no evidence in the

record that Muriel is a drug addict. Muriel's uncontradicted testimony was that he did not abuse drugs or alcohol. While Muriel's testimony is suspect due to his criminal background, the reasonable doubt threshold can be overcome if the testimony is partially corroborated. *Anders*, 228 Ill. App. 3d at 464.

The State argues that Muriel's testimony was not as crucial as defendant asserts and was corroborated by the testimony of Officer Johnson. Furthermore, the State stresses, the jury was well aware of Muriel's prior criminal history and was instructed as follows:

"Evidence that a witness has been convicted of an offense may be considered by you only as it will affect the believability of a witness."

The State compares this case to *People v. Foules*, 258 Ill. App. 3d 645, 630 N.E.2d 895 (1993), where police officers arrested the defendant for possession of cocaine with intent to deliver after they made an investigatory stop. The defendant argued that the testimony of the arresting officers lacked credibility because their version of events was inherently improbable, unsatisfactory, unconvincing, and contrary to human experience. Among other things, the defendant complained that the officers failed to inventory and fingerprint the bag in which the cocaine and drug paraphernalia were discovered and failed to photograph the car to corroborate their testimony. *Foules*, 258 Ill. App. 3d at 652-53. The reviewing court rejected the defendant's argument because a review of all the evidence revealed nothing to impugn the officers' credibility. *Foules*, 258 Ill. App. 3d at 654.

Another case on which the State relies is *Anders*, 228 Ill. App. 3d 456, 592 N.E.2d 652, where the conviction for unlawful delivery of a controlled substance was affirmed despite the fact the undercover police officer was not present when the drug transaction took place between the defendant and the government informant, an admitted cocaine addict who had initiated the undercover operation to clear a charge of driving while his license was suspended. *Anders*, 228 Ill. App. 3d at 463. The cigarette package that contained the cocaine was never tested for fingerprints, the informant's home and the bathroom where the drug transaction took place were not searched prior to the drug buy, and only a pat-down search was performed on the informant before he purchased the drugs from the defendant. *Anders*, 228 Ill. App. 3d at 463-64. The court concluded that the jury could have reasonably concluded that the defendant was guilty and held that the inaction went only to the weight of the informant's testimony. *Anders*, 228 Ill. App. 3d at 463-64.

A case similar to this one is *People v. Thomas*, 222 Ill. App. 3d 1051, 1052-53, 584 N.E.2d 1030 (1991), where the defendant's convic-

tion for delivery of a controlled substance was affirmed despite there being no testimony that the defendant ever handled the drugs and the codefendant testified that he did not see the defendant take money from the undercover police officer who set up the drug buy. In addition to an audiotape, which revealed that an undercover police officer arranged a narcotics purchase from the defendant, the officer testified that he gave the money to the defendant and was later told to pick up the narcotics in a certain location, which he did. *Thomas*, 222 Ill. App. 3d at 1053.

In *People v. LeCour*, 273 Ill. App. 3d 1003, 1007, 652 N.E.2d 1221 (1995), the defendant argued that the evidence was insufficient to sustain his conviction because the police failed to uncover narcotics or money from him and because the State's case was based primarily on the unreliable testimony of an informant, a drug addict, who was not searched for cocaine prior to his meeting with the defendant. The appellate court affirmed the conviction because the officers conducting the surveillance corroborated the informant's testimony about his meetings with the defendant and the informant either produced cocaine for the officers or tried to discard the cocaine after each of his three meetings with the defendant. *LeCour*, 273 Ill. App. 3d at 1008.

A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Gilliam*, 172 Ill. 2d 484, 515, 670 N.E.2d 606 (1996); *People v. McDonald*, 168 Ill. 2d 420, 443, 660 N.E.2d 832 (1995). The court's duty is not to ask itself whether it believes the evidence establishes guilt, but whether the evidence viewed in a light most favorable to the prosecution would allow any rational trier of fact to find the essential elements of the crime proved beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979); *Gilliam*, 172 Ill. 2d at 515.

A conviction shall not be reversed simply because the defendant claims a witness was not credible. *People v. Smith*, 177 Ill. 2d 53, 74, 685 N.E.2d 880 (1997); *People v. Byron*, 164 Ill. 2d 279, 299, 647 N.E.2d 946 (1995). Instead, determinations of credibility of the witnesses, the weight given their testimony, and the reasonable inferences to be drawn from the evidence are the responsibilities of the trier of fact. *People v. Enis*, 163 Ill. 2d 367, 393, 645 N.E.2d 856 (1994); *People v. Mullen*, 141 Ill. 2d 394, 403, 566 N.E.2d 222 (1990). A reviewing court may not override a determination on credibility unless those findings are unreasonable and not based on the evidence. *Enis*, 163 Ill. 2d at 393.

It is clear, upon reviewing all the evidence, that if the State's witnesses, including Muriel, were believed, there was sufficient evidence

to support the conviction. Although there are inherent problems with Muriel's credibility due to his criminal background and his incarceration at the time of the trial, the jury heard that evidence and was instructed to consider Muriel's background when deciding on his credibility. As a result, a rational trier of fact could have resolved the conflicts in the testimony in the prosecution's favor. There is nothing inherently improbable about Muriel's testimony and the evidence is not so unreasonable or unsatisfactory that it raises a reasonable doubt of defendant's guilt.

■ Defendant's other arguments are both based on alleged violations of *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194, and its progeny. Defendant contends that the State violated *Brady* by withholding evidence that Muriel received a greatly reduced sentence in exchange for his testimony against defendant and by allowing Muriel's perjured testimony that he did not receive any deal with the government for his testimony.

The rule of *Brady*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194, applies in three different situations involving the discovery, after trial, of information favorable to the defendant that had been known to the prosecution but unknown to the defense. *United States v. Bagley*, 473 U.S. 667, 678, 87 L. Ed. 2d 481, 491-92, 105 S. Ct. 3375, 3381 (1985); *United States v. Agurs*, 427 U.S. 97, 103, 49 L. Ed. 2d 342, 349, 96 S. Ct. 2392, 2397 (1976). When the prosecution's case includes perjured testimony and the prosecution knew, or should have known, of the perjury, the conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. *Agurs*, 427 U.S. at 103, 49 L. Ed. 2d at 349-50, 96 S. Ct. at 2397; *Giglio v. United States*, 405 U.S. 150, 154, 31 L. Ed. 2d 104, 108, 92 S. Ct. 763, 766 (1972). The second situation occurs when the prosecution suppresses evidence favorable to the defendant after a pretrial request for specific evidence. *Brady*, 373 U.S. at 87, 10 L. Ed. 2d at 218, 83 S. Ct. at 1196-97. If the suppressed evidence is material in that it might have affected the outcome of the trial, the conviction must be reversed. *Agurs*, 427 U.S. at 104, 49 L. Ed. 2d at 350, 96 S. Ct. at 2398. The third situation is where there is a general request or no request for evidence. *Agurs*, 427 U.S. at 107, 49 L. Ed. 2d at 351, 96 S. Ct. at 2399. If the omitted evidence creates a reasonable doubt that did not otherwise exist, a constitutional error occurred. *Agurs*, 427 U.S. at 112, 49 L. Ed. 2d at 355, 96 S. Ct. at 2402. In that case, the omission must be evaluated in the context of the entire record. *Agurs*, 427 U.S. at 112, 49 L. Ed. 2d at 355, 96 S. Ct. at 2402. This third situation is not involved in this appeal.

■ Regarding disclosure of Muriel's sentence, defendant's pretrial discovery motion requested the following:

"Any record of any criminal or civil action pending against any persons whom the State intends to call as witnesses in any hearing or trial involving the People of the State of Illinois *** or whether there has been any such action pending since the date of the alleged offense which is the basis for this prosecution, the nature of such action and *any outcome* thereof." (Emphasis added.)

At the time of defendant's arrest, Muriel was in jail awaiting trial on two unrelated burglary cases. Before this trial was held, Muriel pleaded guilty to both burglary charges and received two concurrent sentences of six years' imprisonment. Although the sentence for each offense was a minimum of six years' imprisonment, Muriel could not properly be sentenced to concurrent sentences because he committed one of the burglaries while on bond for the other, which required consecutive sentencing. The Code of Criminal Procedure provides: "If a person charged with a felony commits a separate felony while on pretrial release *** the sentences imposed upon conviction of these felonies shall be served consecutively regardless of the order in which the judgments of conviction are entered." 730 ILCS 5/5—8—4(h) (West 1996); *People v. Wilson*, 181 Ill. 2d 409 (1998). Moreover, the State's Attorney's file, discovered by the defense after defendant was convicted, showed that Muriel's illegal sentence was "OK'd" by a supervisor in the State's Attorney's office because Muriel had worked as an informant for the State's Attorney's public integrity unit.

The State argues, as it did in *People v. Nino*, 279 Ill. App. 3d 1027, 665 N.E.2d 847 (1996), that the information in its file does not establish that the State agreed to a reduced sentence in exchange for Muriel's testimony or what, if anything, was communicated to Muriel. We disagree. There is no doubt that before this trial Muriel received, with the State's assent, an unlawful sentence.

As the Illinois Supreme Court has stated, this court does not have to ignore common sense. *People v. Jimerson*, 166 Ill. 2d 211, 227, 652 N.E.2d 278 (1995). One consideration in determining whether there was a deal between the State and one of its witnesses is the ultimate disposition of the witness's criminal case. *Jimerson*, 166 Ill. 2d at 227. An agreement between the State and its witness does not have to be so specific that it satisfies the traditional requirements for an enforceable contract. *Jimerson*, 166 Ill. 2d at 227.

There was testimony by Investigator Sullivan that Muriel came to him looking for special treatment in exchange for his cooperation in the arrest of a correctional officer for delivering drugs into the jail. Sullivan explained that Muriel knew that he had to go to the State's Attorney for any such deal. Subsequently, Muriel received concurrent sentences for his two burglary convictions even though the law

requires that the sentences be consecutive. Moreover, a supervisor in the State's Attorney's office approved the sentence as part of the plea agreement because Muriel had cooperated with the State's Attorney's public integrity unit. Those circumstances, taken as a whole, indicate that a deal was made between Muriel and the State whereby Muriel would testify in this trial in exchange for a lower sentence in his own conviction. While the deal may not have been voiced, it is clear that there was at least an implicit agreement made.

Consequently, we find that the State committed a *Brady* violation when it neither showed the concurrent sentence approval memo to defense counsel nor told him about the deal for an unlawful sentence. We also find that the State violated *Brady* by allowing Muriel's perjured testimony to go uncorrected.

At trial, Muriel falsely testified that he did not seek or receive any promises of leniency, that his motive was to rid the county jail of drug dealing. Instead of correcting Muriel's false testimony, as it is required to do, the State compounded its error by telling the jury during its closing argument that there was in fact no agreement between the State and Muriel. During final argument, in rebuttal, the prosecutor stated:

> "[I]t was a judge who sentenced George Muriel to six years, it was not the State's Attorney's office. Unfortunately the State's Attorney's office cannot sentence convicted felons.
>
> It would be nice but that isn't the way it is. The judge sentenced him to six years for stealing a lawn mower and guitar and that's not too shabby of a sentence. There's absolutely no evidence presented and you can only consider evidence that there was any sort of deal *and there wasn't.*" (Emphasis added.)

The State's knowing use of perjured testimony to obtain a criminal conviction constitutes a violation of due process of law. *People v. Steidl*, 177 Ill. 2d 239, 261, 685 N.E.2d 1335 (1997); *People v. Olinger*, 176 Ill. 2d 326, 345, 680 N.E.2d 321 (1997); *People v. Jimerson*, 166 Ill. 2d 211, 223, 652 N.E.2d 278 (1995). The law is well settled that a prosecutor cannot knowingly use, or allow to go uncorrected, perjured testimony that goes to the substance of a witness's testimony or to facts that bear on the witness's credibility. *Bagley*, 473 U.S. at 678, 87 L. Ed. 2d at 492, 105 S. Ct. at 3381-82; *Agurs*, 427 U.S. at 103, 49 L. Ed. 2d at 349-50, 96 S. Ct. at 2397; *People v. Brown*, 169 Ill. 2d 94, 103, 660 N.E.2d 964 (1995). This includes both exculpatory evidence and impeachment evidence. *Bagley*, 473 U.S. at 676, 87 L. Ed. 2d at 490, 105 S. Ct. at 3380. Evidence of any understanding or agreement between a witness and the prosecution as to any future prosecution is relevant to the witness's credibility and the jury is entitled to know

about it. *Giglio*, 405 U.S. at 155, 31 L. Ed. 2d at 109, 92 S. Ct. at 766. To establish a due process violation, the trial prosecutor need not have known that the testimony was false; it is enough that there was knowledge by representatives or agents of the prosecution. *Giglio*, 405 U.S. at 154, 31 L. Ed. 2d at 109, 92 S. Ct. at 766; *Brown*, 169 Ill. 2d at 103.

The following cases are helpful.

In *Napue v. Illinois*, 360 U.S. 264, 265, 3 L. Ed. 2d 1217, 1218, 79 S. Ct. 1173, 1175 (1959), the principal state witness testified that he had received no promise of consideration in return for his testimony. Even though the assistant State's Attorney had in fact promised him consideration if he would testify at trial, he did nothing to correct the witness's false testimony. *Napue*, 360 U.S. at 265, 3 L. Ed. 2d at 1218, 79 S. Ct. at 1175. The United States Supreme Court held that the prosecutor's failure to correct the witness's testimony resulted in a due process violation despite the fact the jury had been apprised of other grounds for believing that the witness may have had an interest in testifying against the defendant. *Napue*, 360 U.S. at 270, 3 L. Ed. 2d at 1221-22, 79 S. Ct. at 1177. The Court concluded that the false testimony may have had an effect on the outcome of the trial. *Napue*, 360 U.S. at 272, 3 L. Ed. 2d at 1223, 79 S. Ct. at 1179.

In *Giglio*, 405 U.S. 150, 31 L. Ed. 2d 104, 92 S. Ct. 763, a new trial was ordered because the prosecution failed to disclose an alleged promise made to its key witness that he would not be prosecuted if he testified for the prosecution. Although the witness testified that he had not received any promises for his testimony, an assistant State's Attorney who did not try the case had in fact promised the witness that he would not be prosecuted if he testified. *Giglio*, 405 U.S. at 152, 31 L. Ed. 2d at 107, 92 S. Ct. at 765. Despite that prosecutor telling the trial prosecutor no promises had been made, the defendant's due process rights were violated by the nondisclosure. *Giglio*, 405 U.S. at 152, 155, 31 L. Ed. 2d at 104, 109, 92 S. Ct. at 765, 766.

Based on the record in this case and the case law, it is clear that the State improperly failed to disclose Muriel's sentence agreement with the State before trial and improperly allowed Muriel's false testimony to go uncorrected. Therefore, we must decide whether the failure to disclose the sentence and to correct the perjured testimony may have contributed to defendant's convictions.

■ Before the violation of defendant's constitutional right to due process can be held to be harmless, this court must be able to declare a belief that the violation was harmless beyond a reasonable doubt. In this case, the State had the burden to demonstrate beyond a reasonable doubt that the violation did not contribute to defendant's conviction. *Chapman v. California*, 386 U.S. 18, 24, 26, 17 L. Ed. 2d 705,

710, 711, 87 S. Ct. 824, 828, 829 (1967); *People v. Smith*, 38 Ill. 2d 13, 230 N.E.2d 188 (1967). This is because it was the prosecution that violated the constitution. If the prosecution knowingly permits false testimony to be used, the defendant is entitled to a new trial. *Napue*, 360 U.S. at 269, 3 L. Ed. 2d at 1221, 79 S. Ct. at 1177; *Steidl*, 177 Ill. 2d at 261-62.

Also, the question is not whether admission of the evidence would have more likely than not resulted in a different verdict, but whether, in the absence of the evidence, the defendant received a fair trial, which is a trial resulting in a verdict worthy of confidence. *Kyles*, 514 U.S. at 434, 131 L. Ed. 2d at 506, 115 S. Ct. at 1566. We consider the State's conduct to have been outrageous and we will not tolerate it. The State made a deal with Muriel whereby he would get a lower, illegal sentence in exchange for his testimony in this case. That action raises questions about the State's integrity and goes to the heart of the judicial system—confidence in the fact-finding process.

■ A conviction obtained by the knowing use of perjured testimony must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury's verdict. *Bagley*, 473 U.S. at 678-80, 87 L. Ed. 2d at 491-93, 105 S. Ct. at 3381-82; *Steidl*, 177 Ill. 2d at 261-62; *Olinger*, 176 Ill. 2d at 345. The State has not demonstrated that the use of Muriel's testimony and the State's denial of a deal did not contribute to defendant's conviction. Muriel was an important State witness. While his testimony was not the only evidence, it was crucial.

In the final analysis, the real question is whether defendant received a fair trial, a trial resulting in a "verdict worthy of confidence." *Kyles*, 514 U.S. at 434, 131 L. Ed. 2d at 506, 115 S. Ct. at 1566. We think not. Because we believe this defendant did not receive a fair trial and because we believe the integrity of our criminal justice system has been tainted by what happened here, we reverse the conviction and remand for a new trial.

For double jeopardy purposes, we conclude that the evidence presented at trial was sufficient for a jury to decide that defendant was guilty beyond a reasonable doubt. We are not making a finding as to defendant's guilt or innocence that will be binding in a new trial but, rather, our consideration of the evidence admitted at trial will protect defendant's constitutional right against double jeopardy. See *People v. Olivera*, 164 Ill. 2d 382, 393, 647 N.E.2d 926 (1995); *People v. Taylor*, 76 Ill. 2d 289, 309-10, 391 N.E.2d 366 (1979).

Reversed and remanded.

McNAMARA and WOLFSON, JJ., concur.